**ST. JOSEPH HOSPITAL, A DIVISION OF SISTERS OF CHARITY OF THE INCARNATE WORD, a not-for-profit corporation; and St. Elizabeth Hospital of Houston, a not-for-profit corporation, on behalf of themselves and others similarly situated,**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION; National Heritage Insurance Company; Texas Department of Human Resources; Marlin Johnston; Larry Tonn; David Behne; and Will Brown.**

Civ. A. No. H–81–3363.

United States District Court,
S.D. Texas,
Houston Division.

Oct. 19, 1983.

J.D. Epstein, Wood, Lucksinger & Epstein, Houston, Tex., for plaintiffs.

R. Doak Bishop, Hughes & Hill, Dallas, Tex., Chris T. Hanger, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM AND ORDER

### I. The Nature of the Case

DeANDA, District Judge.

This litigation arises out of recoupment proceedings undertaken by the Texas Department of Human Resources ("Department") to recover overpayments made to certain Medicaid providers. The Plaintiffs are two privately-owned hospitals located in Houston, Texas ("hospitals"). The Defendants may be classed into two groups. The first group is comprised of the Texas Department of Human Resources, its Commissioner, Marlin Johnston, and Larry Tonn, a Department official ("State"). The second group includes the National Heritage Insurance Company, which has administered the Medicaid program for the State since 1977, Electronic Data Systems Corporation, the parent organization of National Heritage, David Behne, Program Director of National Heritage, and Will Brown, a National Heritage employee ("NHIC").[1]

The hospitals have acted and continue to act as providers of services under the Texas Medicaid Program. The rights, duties and obligations of the hospitals and the State regarding the program are set forth in contracts known as Provider Agree-

---

**1.** The administration of Texas' Medicaid Program is the responsibility of the Department of Human Resources. Tex.Hum.Res.Code Ann. § 32.021 (Vernon 1980). The Department has chosen to delegate its administrative responsibilities to NHIC. This delegation is properly allowed under both federal regulation and state law. 42 C.F.R. § 431.502; Tex.Hum.Res.Code, *supra*, § 32.029. Hence NHIC clearly acted as an agent of the Department in administering the Medicaid Program.

ments. NHIC's duty is to receive, process and pay providers' claims for services rendered to Medicaid patients in accordance with the Provider Agreements and the applicable statutes and regulations.

The Texas Medicaid Program provides for payment to providers for the first thirty days of inpatient hospital services per "spell of illness." A spell of illness is a continuous period of hospital confinement. Successive periods of confinement are deemed to be continuous unless the last date of discharge and the date of readmission are separated by at least sixty consecutive days. Tex.Admin.Code tit. 40, §§ 29.-1001, 29.603 (Nov. 1981). The program does not allow payment for services rendered outside the spell of illness period.

An internal audit was undertaken by the Department of Human Resources in the normal course of its affairs in 1981. After the audit was completed it became apparent that various Texas hospitals had been erroneously paid an aggregate of some $3,000,000.00 for services rendered to Medicaid patients who had exhausted their coverage under the spell of illness regulation. The State and NHIC notified the hospitals of these overpayments in September, 1981, and began the recoupment efforts which have engendered the instant suit. The recoupments were undertaken pursuant to Tex.Admin.Code tit. 40, § 79.2301 (Nov. 1981), which requires the Department to recover all provider payments "which are received under fraudulent circumstances ... and/or through error or misunderstanding." As of June, 1983, approximately $2,288,000.00 had been returned to the Texas Medicaid Program. NHIC has recouped a total of $1,094,260.90 from over 200 hospitals and $1,193,728.08 has been voluntarily refunded by hospitals in response to the notifications of overpayment. All of the recouped and refunded monies

have been placed in the Risk Stabilization Reserve ("RSR") fund. The State of Texas holds title to the RSR fund. About $560,-000.00 in outstanding overpayments remains to be recouped and placed in the RSR fund.[2]

The hospitals have brought suit here for declaratory and injunctive relief and for monetary damages, alleging that the State and NHIC Defendants (1) violated the Provider Agreements in effecting the recoupments; (2) violated the Medicaid and Medicare laws and regulations; and (3) failed to comply with the requirements of due process, thereby denying the hospitals their civil rights within the meaning of 42 U.S.C. § 1983. The Defendants have countered these claims by moving for dismissal under Rule 12(b), F.R.C.P., and/or for summary judgment.

## II. The § 1983 Claims

The gist of the hospitals' civil rights complaint is that the Defendants have failed to provide sufficient notice of the bases on which recoupment is sought and have not provided a fair and impartial forum in which the recoupments may be contested prior to effecting them. The hospitals urge this Court to accept the proposition that these alleged failures deprive the hospitals of property without due process of law in violation of the Fifth and Fourteenth Amendments to the federal Constitution.[3] As will become clear from the following discussion and analysis, the hospitals' § 1983 claim is, at best, a specious one.

The threshold inquiry in any § 1983 case must be to determine (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of some right, privilege or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d

**2.** The facts set forth in this paragraph are established by various affidavits, which have not been controverted, and by answers to interrogatories filed in this cause.

**3.** We note that the Fifth Amendment applies only to the *federal* government. Since there is

no allegation that the various Defendants acted on behalf of the federal government, the Fifth Amendment is inapposite by its terms. With this in mind, the Plaintiffs' claims must be viewed only in terms of an alleged Fourteenth Amendment violation.

420 (1981). The first prong of the inquiry is not in dispute here,[4] but the question of whether the second prong can be established has been hotly contested by the parties.

 Procedural due process is not invoked by every governmental action which adversely affects private interests; rather, due process safeguards apply only when a person is deprived of life, liberty or property without due process of law. *Cervoni v. Secretary of Health, Education and Welfare*, 581 F.2d 1010, 1017 (1st Cir.1978). A property interest must be secured by statute, legal rule or through a mutually explicit understanding between government and individual. *Geriatrics, Inc. v. Harris*, 640 F.2d 262, 264 (10th Cir.1981). Stated another way, valid property interests are not created by the Constitution itself but instead such interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Grossman v. Axelrod*, 646 F.2d 768 (2d Cir.1981).

The Defendants have presented a plethora of citations in support of their argument that the hospitals have no vested property right under the instant facts. A number of these cases deserve individual attention. In *Geriatrics, Inc. v. Harris, supra* at 265, the Court stated that the provider (in that case, a nursing home) is not the intended beneficiary of the Medicaid program since the underlying purpose of the medical assistance funding program is to extend financial benefits to patients who are eligible to receive their medical care at government expense. The *Geriatrics* court went on to hold that since the provider had no vested property interest in the continuation of its provider contract, a pre-termination hearing was not required. The court noted that

the provider's financial need is merely "incidental" to the purpose and design of the Medicaid and Medicare programs. *Id.*, at 265; *see also Case v. Weinberger*, 523 F.2d 602, 607 (2d Cir.1975). In *Cervoni, supra,* the court reached virtually the same conclusion in regard to a physician. Physicians do not have a valid property interest in their continuing eligibility to receive reimbursement under Part B of the Medicare program. *Id.*, at 1018. *Grossman v. Axelrod, supra,* held that under the New York Medicaid law, providers have no property right in prospective reimbursement payments. Further, providers have no due process right to compensation for amounts recouped as a result of a reduced reimbursement rate since the amounts thus recouped constitute a recovery of overpayments. *Id.*, at 771.

 The above authorities clearly establish that providers are not the intended beneficiaries of the Medicaid program. While there are situations where a provider may have acquired some vested property interest (*see e.g. Case v. Weinberger, supra* ), this case does not present such a situation. Upon reviewing the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, the relevant portions of the Texas Human Resources Code, the state and federal regulations, and the Provider Agreements entered into between the hospitals and the State, we are unable to discern any provision which creates a vested property right for providers under facts such as those of the instant case. We have found no case which is *precisely* on point but nonetheless we are convinced that the hospitals have no vested property interest in retaining the spell of illness overpayments. This conclusion is predicated on the sound principles enunciated in the cases discussed above and on our examination of the pertinent statutes, regulations and agreements.[5] Hence the

---

4. The Defendants in fact stress that they acted on behalf of the State of Texas.

5. At this juncture we note that part of the hospitals' overall position rests on the asserted applicability of 42 U.S.C. § 1395gg, a portion of the Medicare Act. The basis for this assertion is

utterly mystifying. Further, the hospitals are attempting to mix "apples and oranges" with this argument since the Medicaid and Medicare Acts are discrete programs. We cannot locate any sections of the Provider Agreements or the state Medicaid laws which support the hospitals' attempt to engraft § 1395gg onto the state Med-

§ 1983 cause fails to state a claim for which relief can be granted and must be dismissed.

■ If our conclusion that the Plaintiffs have failed to establish a crucial element of their § 1983 claim is incorrect, the Defendants are nevertheless entitled to a summary judgment on the § 1983 cause. Summary judgment should be entered when the record shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c), F.R.C.P.; *Poller v. Columbia Broadcasting Systems, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).[6] The uncontroverted affidavits and exhibits filed in this case establish that the hospitals were given ample and relatively detailed notice and an opportunity for a fair hearing.

The Department provides an appeal procedure for providers who wish to dispute actions taken by the Department. First, an appeal may be taken before the Contract Appeals Committee. An adverse decision before that Committee may be taken to the Department's Commission for review. Medicaid Provider Manual § 5037; TDHR Fair Hearings Handbook §§ 1700–1770, esp. §§ 1712, 1715–1720, and 1770. The Provider Manual is supplied to each provider and the Fair Hearings Handbook is a readily-obtained public document. Moreover, the hospitals were provided notification of the recoupments process by NHIC in September of 1981 and the notification letters advised the providers of the appeals process discussed immediately above. (The regulations upon which the recoupments were undertaken are set forth in the Texas Administrative Code and Texas Register, neither of which are obscure or hidden sources of information.) Finally, we note that Larry Tonn, a Defendant herein, furnished fairly detailed information regard-

ing the appeals process to the Plaintiffs' attorney in response to a letter from that attorney written in December, 1981.[7] These facts establish that the Plaintiffs were given fair notice of the recoupment proceedings at issue *and* were informed of the appeals process which is available to the hospitals.

Section 1733 of the TDHR Fair Hearings Handbook requires a contract appeal hearing to be conducted in accordance with the Texas Administrative Procedure Act, Art. 6252–13a, Tex.Rev.Civ.Stat.Ann. (Supp. 1982). The APA provides for judicial review in the state district courts of Travis County, Texas, upon the application of any aggrieved party who has exhausted the administrative remedies available within the agency. *Id.,* § 19(a). Hence, even if the appellate forums offered by the Department proved to be "inadequate" or failed to provide a fair hearing to the hospitals, any defects in the administrative appeals process could be rectified by the Texas state courts.

■ Due process is a flexible concept which mandates such procedural protections as the particular situation at hand demands. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). Accordingly, resolving the issue of whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Id.,* at 334–335, 96 S.Ct. at 902–903. *Eldridge* set forth a three-step analysis as guidance for reviewing the procedural adequacy of administrative activities that adversely affect property rights. First, we must examine the degree of potential deprivation that may be created by a particular administrative decision. *Id.,* at 341, 96 S.Ct. at 905. Second, this Court must consider the fair-

---

icaid program. Therefore, we will not give any further consideration to any of the Plaintiffs' assertions which rest upon § 1395gg.

**6.** This is true even where the case is complex. *Erco Industries, Ltd. v. Seaboard Coast Line Railroad,* 644 F.2d 424 (5th Cir.1981).

**7.** Will Brown, of NHIC, toured Texas hospitals in order to explain the recoupments in detail, and supplemental notices were sent to providers in May, 1982 regarding the recoupments. It is fair to conclude that the Defendants "bent over backwards" to give notice to the providers.

ness and reliability of the existing procedures and the probable value, if any, of additional safeguards. *Id.*, at 343, 96 S.Ct. at 907. Third, the Court must assess the public interest, including the societal costs that would be associated with requiring a pre-deprivation hearing. *Id.*, at 347, 96 S.Ct. at 908.

This Court is convinced that the recoupment proceedings, coupled with the administrative procedures which were discussed above, pass the *Eldridge* test with flying colors. At issue here is a relatively small fraction of the Plaintiffs' revenues. Further, if the Department audits are correct, the funds at issue do not even "belong" to the providers under any circumstances. The available procedures afford much in the way of reliability and fairness. We can discern no probable value to the imposition of any additional procedural safeguards. The public interest factor strongly militates against the hospitals' position since the public has a very strong interest in promptly recovering a debt, totalling almost $3,000,000.00, that has been due for several years. (One must bear in mind that the monies at issue here represent tax dollars.) Hence the interests of the State and its taxpayers far outweigh those of the providers.

We conclude, based on all of the above facts, authorities and analysis, that even if the hospitals have stated a claim under § 1983, there can be no finding of liability on the part of any of the Defendants herein. The requirements of due process have been fully satisfied.[8] The Defendants' motions for summary judgment, as to the § 1983 claims, are hereby GRANTED.

### III. The Bar of Sovereign Immunity

 The Defendants argue that the instant suit is barred by the Eleventh Amendment. The Court agrees. The Eleventh Amendment clearly stands as an absolute bar to federal suits against a state for retroactive monetary relief, unless the state consents to suit in federal court. It partakes of the nature of a jurisdictional bar, severely limiting the power of the federal judiciary to hear claims by private persons against a state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The immunity of an unconsenting state applies to suits brought by its own citizens and to suits brought by citizens of a sister state. *Great Northern Life Ins. Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The immunity clearly extends beyond the state itself and encompasses state agencies, officers and employees whenever "the action is in essence one for the recovery of money from the state." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *Karpovs v. State of Mississippi*, 663 F.2d 640 (5th Cir.1981).

The Supreme Court has held in a case extremely similar to the instant one that the Eleventh Amendment does indeed bar any action for monetary damages. *Florida Department of Health v. Florida Nursing Home*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). We are of the opinion that *Florida Nursing Home* is controlling here and mandates a dismissal, at least vis-a-vis the State Defendants. Further, under *Cory v. White*, 457 U.S. 85, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982), the claims for injunctive relief must be dismissed as well. The remaining claims, which pray for declaratory relief, must also be dismissed since it is clear that the declaratory judgments, if entered, would be essentially and effectively an imposition of injunctive relief which is barred by *Cory*.

---

**8.** The recent case of *5124 Drug Corporation v. Human Resources Administration of the City of New York*, 539 F.Supp. 1113 (S.D.N.Y.1982) reached the same conclusion under very similar facts. Judge Lasker held in *5124 Drug* that the City's proposed recoupment scheme, by which it sought to obtain reimbursement of alleged Medicaid overpayments to pharmacists-providers, satisfied due process even though the hearings were not to be conducted until after recoupment had begun. *5124 Drug* was decided in the context of an action for preliminary injunction and did not specifically address the question of imposing liability under § 1983. Nonetheless, the principles underlying *5124 Drug* clearly apply in the instant case.

■ The NHIC Defendants acted as agents for the State of Texas and the Department. At the very least, NHIC acted as a "fiscal intermediary" for the processing of Medicaid claims. It is by now well-settled that such intermediaries are entitled to the same cloak of immunity enjoyed by the State. *Matranga v. Travelers Insurance Co.*, 563 F.2d 677 (5th Cir.1977); *Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55 (5th Cir.), *cert. denied*, 422 U.S. 1043, 95 S.Ct. 2657, 45 L.Ed.2d 694 (1975); *Vanderberg v. Carter*, 523 F.Supp. 279 (N.D.Ga.1981), *aff'd* 691 F.2d 510 (11th Cir. 1982); *Pharmacists Society of Milwaukee County, Inc. v. Department of Health & Social Services*, 79 F.R.D. 405 (E.D.Wis. 1978). Therefore the sovereign immunity doctrine bars maintenance of the instant suit against the NHIC Defendants.

The State has not consented to this suit. The individuals named as Defendants have not committed any unconstitutional acts which would strip them of their sovereign immunity (see the discussion of the § 1983 claims above) nor has it been shown that they have exceeded the scope of their statutory authority. The conclusion that this *entire* lawsuit is barred by the Eleventh Amendment is virtually inescapable. Therefore the Court holds that the suit must be dismissed with prejudice.

### IV. Exhaustion of Administrative Remedies

■ Assuming *arguendo* that the Eleventh Amendment did not apply here, this Court is of the opinion that the case must be dismissed without prejudice for the failure of the hospitals to exhaust their administrative remedies.

■ We note at the outset of this segment of our opinion that, as a general proposition, administrative remedies need not be exhausted as a prerequisite to an action brought under § 1983. *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The hospitals have tenaciously seized upon this general proposition in an attempt to defeat the exhaustion requirement. Their reliance on *Patsy* is ill-founded for the two reasons set forth below.

First, the instant claim under § 1983 has been shown to be meritless. Hence it would be erroneous and unwise to allow the mere assertion of a § 1983 cause to annihilate the exhaustion requirement. Second, the *Patsy* doctrine should not apply to a case when the lawsuit arises out of federal statutes enacted after § 1983 which contemplate or require that the state will institute or provide administrative review procedures. *Ryans v. New Jersey Commission for the Blind*, 542 F.Supp. 841 (D.N.J.1982). We agree with the *Ryans* court. In this case, the Medicaid Act expressly contemplates administration and management of the Medicaid Program by the states. *See e.g.*, 42 U.S.C. § 1396a(a)(4, 5). If we were to accept the Plaintiffs' arguments to the contrary, the exhaustion requirement embodied in both the Texas and federal Administrative Procedure Acts would be reduced to meaningless charades since those Acts could be circumvented by merely "crying 1983." We decline to do so.

The exhaustion doctrine contemplates that the real issues in controversy be presented to the administrator, that he be given the opportunity to apply his special skills and experiences to them, that he be permitted to correct errors and that resort to the courts be had only thereafter. *Hudson v. Farmers Home Administration*, 654 F.2d 334, 338 (5th Cir.1981). This set of considerations forms the crux of the exhaustion requirement.

■ The hospitals argue that the yoke of the exhaustion doctrine should be lifted from their shoulders because compliance with exhaustion would be futile. The applicability of this "futility exception" is rare. *Hudson v. FHA, supra*, at 337. Generally speaking, the exception is limited to situations involving grave disabilities in the agency or the administrative process itself. For example, the exception applies where the agency is moribund, *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926), or where it lacks the power to grant any effective remedy. *United States Alkali Export Association*

*v. United States,* 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945). We can discern nothing in the record that could trigger the futility exception in this case.

The hospitals blatantly disregarded the available administrative appeals process. The general rule under such a state of affairs is that unexhausted issues will *not,* in the absence of extraordinary circumstances, be considered by the courts. *Hudson, supra,* at 337; *Beale v. Blount,* 461 F.2d 1133 (5th Cir.1972); 3 K. Davis, *Administrative Law Treatise* § 20.07 (1958; 1976 Supp.). That rule applies here and there is an absence of any extraordinary circumstances.

The hospitals seek to avoid the exhaustion requirement on two other bases. They argue that the Department "lacks the required procedural standards." This argument, which under these facts is murky at best, has been adequately disposed of by our examination of the due process issues in Part II, *supra.* Second, the hospitals contend the policies underlying the exhaustion doctrine are absent in this case. This contention is meritless based on the factors set forth in *Ecology Center of Louisiana, Inc. v. Coleman,* 515 F.2d 860 (5th Cir. 1975) and *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), which govern the determination as to whether exhaustion should be required.

The Fifth Circuit summarized the *McKart* factors in *Coleman,* at 866, as follows: 1) the harshness of the penalty that the plaintiff will suffer if barred from asserting his claims in court; 2) though the penalty not be overwhelmingly harsh, the potential impairment, due to a by-pass of the administrative procedure, of the ability of the agency to perform its functions; 3) whether the issue upon which the decision turns involves matters of particular agency expertise; 4) whether judicial review would be significantly aided by an additional administrative decision, through allowing the agency to make a factual record, apply its

expertise or exercise its discretion; 5) the likelihood that the judiciary will be overburdened with suits stemming from the same administrative "failure" when such suits might have been resolved through the administrative process; and 6) the significance of the role of administrative autonomy, i.e., the notion that the courts should not usurp powers and duties entrusted to the agency, and the related notion that the agency should be given a chance to discover and correct its own errors. We believe that in light of the undisputed facts and the nature of the case, *all* of the *McKart/Coleman* factors operate in favor of requiring exhaustion in this case. (The second, third, fifth and sixth factors weigh most heavily in favor of requiring exhaustion.) Hence we conclude that, as an alternate basis for dismissal, the case should be dismissed for failure to exhaust administrative remedies.[9]

### V. Abstention

 If none of the reasons for dismissal outlined above were present in this case, we would still find that dismissal is mandated by the abstention doctrine as set forth in *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* abstention is proper when a state has established an administrative framework to formulate policy and decide cases in an area of legitimate state interest. The underlying tenets of abstention are rooted in the fundamental concepts of federalism which require the federal judiciary to refrain from hearing matters in the first instance which directly involve important state interests in order to maintain proper harmony in state-federal relations. *Clay v. Sun Insurance Office, Ltd.,* 363 U.S. 207, 211–212, 80 S.Ct. 1222, 1225–1226, 4 L.Ed.2d 1170 (1960); *Meicler v. Aetna Casualty & Surety Co.,* 372 F.Supp. 509, 515 (S.D.Tex.1974), *aff'd* 506 F.2d 732 (5th Cir. 1975); Wright, *Law of Federal Courts* § 52 (1976).

In the instant case the Medicaid Act has established a cooperative state-federal pro-

9. Dismissal under the exhaustion requirement is entered without prejudice. Unless we are shown to be in error regarding our Eleventh Amendment and § 1983 conclusions, however, this case should be dismissed with prejudice and therefore a final judgment in favor of all Defendants is proper.

gram wherein the states actually administer and oversee the payment of benefits and related matters. The State of Texas has erected an elaborate system for the administration of the program. We are therefore of the opinion that this case is one where *Burford* abstention is proper.

### VI. Conclusion

The hospitals have failed to state a claim upon which relief can be granted as to their § 1983 claims. Even if they have established a vested property interest in regard to the § 1983 claims, we find that entry of summary judgment pursuant to Rule 56(d), F.R.C.P., is proper. The remaining claims must be dismissed on the basis of sovereign immunity, pursuant to Rule 12(b)(1), (6). Therefore, an entry of final judgment in favor of all Defendants is required.

Alternatively, we hold that dismissal without prejudice would be correct here on two distinct grounds, namely, the failure of Plaintiffs to exhaust their administrative remedies and abstention under the *Burford* doctrine. However, since we view our rulings under Rules 56 and 12 as controlling the ultimate disposition of the case, dismissal of all claims with prejudice is mandated. All remaining Motions in the case are thereby mooted.