965 F.2d 1239
 37 Soc.Sec.Rep.Ser. 458, Medicare & Medicaid Guide
P 40,323,
3 NDLR P 55
 BETHPHAGE LUTHERAN SERVICE, INC., Plaintiff-Appellant,
v.
Lowell P. WEICKER, Jr., in his official capacity as Governor
of the State of Connecticut; Toni Richardson, Commissioner,
Department of Mental Retardation; Audrey Rowe,
Commissioner, Department of Income Maintenance, Defendants-Appellees.
 No. 949, Docket 91-9052.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1992.
Decided June 2, 1992.
 
 Richard P. Nelson, Lincoln, Neb. (Rochelle Shana Wood, Mark R. Kravitz, Wiggin & Dana, New Haven, Conn.; Nelson Morris Holdeman & Titus, Lincoln, Neb., on the brief), for plaintiff-appellant.
 Arnold I. Menchel, Asst. Atty. Gen., Hartford, Conn. (Richard Blumenthal, Atty. Gen., Richard J. Lynch, James P. Welsh, Asst. Atty. Gens., Hartford, Conn., on the brief), for defendants-appellees.
 Before: LUMBARD, NEWMAN and WINTER, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 Bethphage Lutheran Service, Inc. ("Bethphage"), a Connecticut not-for-profit corporation providing residential and day-care services to persons with mental retardation and other disabilities, appeals from the August 27, 1991, judgment of the United States District Court for the District of Connecticut (Alan H. Nevas, Judge) dismissing its complaint against various Connecticut officials on the ground that abstention was appropriate pursuant to the Burford doctrine. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Bethphage provides services under contract with the Connecticut Department of Mental Retardation ("DMR"). The services are funded jointly by the U.S. Department of Health and Human Services and the State of Connecticut. Bethphage contended that the defendants propose to fund Bethphage's 1991-92 fiscal year service contracts at a level that is inconsistent with the standards of efficiency, economy, and quality of care mandated by federal statute. Bethphage challenges the District Court's abstention decision, contending, among other things, that state law does not afford it an adequate state court remedy and instead remits it to binding arbitration. We disagree with that view of state law and affirm the District Court's decision to abstain.
 
 Background
 
 2
 A. Medicaid. Medicaid, 42 U.S.C. § 1396 et seq., is a cooperative federal-state program through which the federal government provides financial assistance to the states so that the states may furnish medical, rehabilitation, and other services to certain low-income persons. Participation in Medicaid is voluntary, but participating states must comply with certain requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of Health and Human Services ("the Secretary"). For a state to qualify for federal assistance, the Secretary, customarily acting through the Health Care Finance Administration ("HCFA"), must approve a State Plan for medical assistance, 42 U.S.C. § 1396a(a), that contains a comprehensive statement describing the nature and the scope of the state's program. 42 C.F.R. § 430.10 (1989). The plan must designate a single state agency to supervise or administer the State Plan. 42 U.S.C. § 1396a(a)(5).
 
 
 3
 By enacting the Home and Community Based Services Waiver Act ("Waiver Act"), 42 U.S.C. § 1396n(c), Congress has authorized persons with mental retardation or other developmental disabilities to receive Medicaid services in a community setting. The Waiver Act excuses states from satisfying all requirements of the Medicaid Act. To qualify for a waiver, a state must develop alternative regulatory schemes aimed at lowering the cost of medical assistance while at the same time maintaining the level of care. Although the Waiver Act authorizes the Secretary to waive certain requirements of the Medicaid Act, see 42 U.S.C. § 1396n(c)(3), it does not authorize the Secretary to waive any sections of the Medicaid Act governing the health, safety, or welfare of Medicaid recipients. Indeed, the Secretary is not authorized to grant a waiver unless the state provides additional assurances that its waiver plan includes necessary safeguards to protect the health and welfare of individuals provided services under the waiver. 42 U.S.C. § 1396n(c)(2).
 
 
 4
 Since July 1, 1987, the State of Connecticut has funded services for persons with mental retardation or other developmental disabilities under a waiver. The Connecticut Waiver was approved by HCFA and is administered by the Connecticut Department of Mental Retardation ("DMR"). As part of the health and welfare assurances required by the Waiver Act, the defendants have incorporated by reference numerous standards and protections afforded Connecticut residents under state law. The assurances and standards incorporated include Conn.Gen.Stat. § 17a-238(b), which provides that each person placed under the direction of the Commissioner of Mental Retardation shall be protected from harm and receive humane and dignified treatment adequate for that person's needs and for the development of that person's full potential at all times, and Conn.Gen.Stat. 17a-227(b), which requires that DMR regulations insure the comfort, safety, adequate medical care, and treatment of persons with mental retardation or other developmental disabilities in residential facilities.
 
 
 5
 Waiver providers are reimbursed for residential and day program services by DMR pursuant to Conn.Gen.Stat. § 17-313b and Conn. Agencies Regs. §§ 17-313b-1 through 17-313b-18. The residential and day service contracts result from negotiations between DMR and the certified provider, here Bethphage. An operations plan ("OP"), which estimates the provider's expenditures for the fiscal year and serves as the total authorized yearly expenditures, is incorporated into the signed contract. At the close of the contract year, each provider prepares and files an Audited Consolidated Operation Report ("ACOR"), which details actual expenditures. Incurred costs that exceed the contract amount are not reimbursed. Conn. Agencies Regs. § 17-313b-8(1)(i). On the other hand, if the provider has spent less than the estimated cost, the provider is required to return most or all of the difference to DMR. Conn. Agencies Regs. § 17-313b-8(1)(ii). Under the state regulations, negotiations for provider contracts must be based upon information contained in the most recent ACOR, the provider's OP, and other relevant information. Conn. Agencies Regs. § 17-313b-8(v)(5).
 
 
 6
 B. The Bethphage contracts. Bethphage currently serves approximately 154 mentally retarded and developmentally disabled persons. Bethphage's programs have been licensed by DMR and certified by the Department of Income Maintenance ("DIM") for participation as a Waiver Act provider. In 1989 Bethphage entered into its first contract with DMR to provide residential and day services. In the first year of operation, Bethphage instituted cost containment measures which, compared with the previous provider, reduced costs on an annualized basis by $1,185,000. Nevertheless, Bethphage incurred a loss of more than $400,000 over the amount of funding initially approved for it by DMR. Accordingly, DMR made a supplemental grant of nearly $300,000, reducing Bethphage's operating loss to approximately $120,000.
 
 
 7
 The OP approved by DMR for fiscal year 1990-91 was in the original amount of $6,812,055. Several new programs were added to the OP during the year with commensurate additions to the approved funding. If the new programs were annualized on the basis of the approved 1990-91 spending levels for those programs, the annualized OP would be $7,371,960. During the 1990-91 fiscal year, Bethphage instituted additional cost containment measures that resulted in a reduction in costs of approximately $69,000, compared with the previous year's costs. Again, Bethphage incurred an operating loss for the year, based upon unaudited figures, of approximately $220,000.
 
 
 8
 Bethphage appealed the fiscal year 1990-91 funding shortfall to DMR in March of 1991. A hearing was held before the DMR on October 10-11, 1991. At the time of oral argument of this appeal, DMR had not yet rendered a decision.
 
 
 9
 In July 1991, DMR presented Bethphage with an approved OP for fiscal year 1991-92. The OP provides for total authorized expenditures in the amount of $7,201,004. This is a decrease of (1) $170,956 from the 1990-91 OP on an annualized period, (2) $220,000 from 1990-91 spending levels, and (3) $3,144,731 from Bethphage's requested OP.
 
 
 10
 C. The pending lawsuit. Bethphage brought this action in the District Court for preliminary and permanent injunctive relief and a declaratory judgment against Governor Lowell P. Weicker, Jr., Toni Richardson, the Commissioner of the Department of Mental Retardation, and Audrey Rowe, the Commissioner of the Department of Income Maintenance, in their official capacities. Bethphage sued pursuant to 42 U.S.C. § 1983, claiming violations of various provisions of the Medicaid Act and a denial of the right to equal protection and due process under the Fourteenth Amendment. The lawsuit concerns the proposed funding for the 1991-92 fiscal year. Bethphage argues that if it were to reduce the expenditures to the levels funded by the DMR-approved OP, then the level of its services would be substantially reduced, placing in jeopardy the health, safety, and welfare of Bethphage's clients as well as its status as a licensed and certified provider of services.[1] Bethphage seeks (1) a declaratory judgment that defendants' actions are unlawful, (2) a preliminary injunction so that Bethphage need not accept the OP as a condition of funding, (3) a permanent injunction barring defendants from violating a variety of Bethphage's statutory and constitutional rights, and (4) a permanent injunction defining future funding levels.
 
 
 11
 The defendants moved to dismiss the complaint offering a host of arguments. They argued, among other things, that the complaint did not allege the personal involvement of the named officials in the challenged actions, that Bethphage has no legally enforceable rights under 42 U.S.C. § 1396a(a)(13)(A) (the Boren Amendment), that the Eleventh Amendment bars the action, that Bethphage lacks standing to bring the action, and that the Court should abstain. Without reaching the merits of defendants' substantive contentions, the Court granted the motion to dismiss, finding that abstention was appropriate pursuant to the Burford doctrine. Bethphage Lutheran Service, Inc. v. Weicker, 777 F.Supp. 1093 (D.Conn.1991).
 
 Discussion
 
 12
 While the Supreme Court has declared that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them," Colorado River Water Conservation District v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976), it has recognized certain exceptions to this rule. Considerations of comity between federal and state courts, as well as pragmatic considerations of judicial efficiency, have led the Supreme Court to fashion several abstention doctrines.[2] In this case, we need consider only so-called Burford abstention since the District Court relied on this ground and since we agree with the Court's ruling.
 
 
 13
 The Supreme Court has characterized Burford abstention as appropriate where the
 
 
 14
 exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.
 
 
 15
 Colorado River, 424 U.S. at 814, 96 S.Ct. at 1245. We have held that the aim of Burford abstention is to "avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration," American Disposal Services, Inc. v. O'Brien, 839 F.2d 84, 87 (2d Cir.1988). See also Corcoran v. Ardra Insurance Co., Ltd., 842 F.2d 31, 36 (2d Cir.1988) ("[A]bstention pursuant to Burford is designed to avoid federal court interference with specialized ongoing state regulatory schemes...."); Levy v. Lewis, 635 F.2d 960, 963-64 (2d Cir.1980) (Burford abstention appropriate where question involved interplay between insurance law and federal law, because federal review threatens to create incoherence and inequities in administration of state scheme).
 
 
 16
 The District Court, following Hanlin Group v. Power Authority of State of New York, 703 F.Supp. 305 (S.D.N.Y.1989) (court abstained under Burford doctrine from exercising jurisdiction over rate dispute case concerning sale of electric power), aff'd mem., 923 F.2d 844 (2d Cir.1990), looked to three factors in determining that the instant case was appropriate for Burford abstention and then determined that an adequate state court remedy was available. The factors the District Court considered were: "the degree of specificity of the state regulatory scheme, the necessity of discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern," Bethphage Lutheran Service, 777 F.Supp. at 1098.
 
 
 17
 In considering the first of these factors, the District Court noted that the Medicaid Act has established a cooperative state-federal program wherein the states actually administer and oversee the payment of benefits and related matters. The Court noted the eighteen regulatory sections governing, substantively and procedurally, the determination of rates and the inclusion of particular costs. Emphasizing the breadth and specificity of the state Medicaid regulations, the Court found that state law provides a comprehensive statutory framework to formulate policy and decide cases, including opportunities for state court review.[3]
 
 
 18
 The Court then considered whether the state statutes contain broad terms that properly should be interpreted by a state agency and the experts in a particular field. In Burford, the Supreme Court observed that if a statutory standard lends itself to variation in its application and if conflicts in interpretation would be dangerous to the success of state policies, federal courts should abstain. 319 U.S. at 332-34, 63 S.Ct. at 1106-08 (court should abstain from determining whether Railroad Commission's order complied with "reasonableness" standard under state statute). Here, in order to comply with the health and welfare assurances required by the Waiver Act, the defendants have incorporated by reference numerous standards and protections afforded Connecticut residents under state law. The District Court held that the statutory framework at issue necessarily invokes the expertise and best judgment of the Commissioner of Mental Retardation and does not lend itself to consistent judicial interpretation. The Court noted that reasonable persons can disagree as to what constitutes reasonable payments for necessary services under the Waiver Act and that a federal court might establish reimbursement rates either above or below those determined in state court. The absence of consistency " 'would create a divisive reimbursement rate in which providers with substantially the same needs are reimbursed at different rates, encouraging plaintiffs to forum shop.' " Bethphage Lutheran Service, 777 F.Supp. at 1100 (quoting Hanlin, 703 F.Supp. at 309). Therefore, the Court concluded that " 'proper respect for the expertise of state officials and the expeditious and evenhanded administration of [the] state program[ ] counsels restraint,' " id. (quoting Levy, 635 F.2d at 964), and suggests that Burford abstention is appropriate.
 
 
 19
 As to the third consideration, the District Court found that abstention under Burford was appropriate because the subject matter of this case--reimbursement rates under the Medicaid Act--is an area of legitimate state interest. The Court noted that the Medicaid Act itself requires the creation of a state administrative framework to establish methods and procedures for the procurement of and payment for care and services consistent with efficiency, economy, and quality of care. Thus, Congress has recognized that the establishment and review of reimbursement rates is a legitimate state concern.[4]
 
 
 20
 The Court then considered the availability of a state remedy and determined that an adequate state remedy is available to Bethphage to enable it to challenge the service rates that are set by the Commissioner of Mental Retardation. Section 17-313b-18 of the state regulations provides in relevant part:
 
 
 21
 Any organization which is aggrieved by any rate decision pursuant to these regulations by the Commissioner of Income Maintenance or the Commissioner of Mental Retardation may, within ten days after written notice thereof from the commissioner issuing the decision obtain by written request from the commissioner issuing the decision a hearing on all items of aggrievement.... Hearings and all subsequent appeals therefrom before the Commissioner of Mental Retardation shall be conducted in accordance with the procedure specified in Sections 19-570-1 through 19-570-60 of the Regulations of Connecticut State Agencies.
 
 
 22
 The administrative decision of the Commissioner of Mental Retardation is then subject to appeal to State Superior Court and, ultimately, the State Supreme Court, pursuant to Conn.Gen.Stats. § 4-183, a section of the Uniform Administrative Procedure Act. See Conn. Agencies Regs. § 19-570-57. The Superior Court may reverse an agency determination that is "in violation of constitutional or statutory provisions." Id.[5]
 
 
 23
 The Supreme Court has recognized that the factors relevant to abstention analysis are "to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 21, 103 S.Ct. 927, 940, 74 L.Ed.2d 765 (1983). We have granted the district courts some latitude in their decision-making, and we apply an abuse of discretion standard on review, Law Enforcement Ins. Co. v. Corcoran, 807 F.2d 38, 40 (2nd Cir.1986), though the review is somewhat rigorous in view of the fact that we are considering an exception to a court's normal duty to adjudicate a controversy properly before it. As the Ninth Circuit has pointed out:
 
 
 24
 [I]n [abstention] cases this abuse of discretion standard should not be confused "with the broader abuse of discretion standard applicable in other areas, such as rulings on certain evidentiary questions and post-trial motions. [Rather] ... in cases involving abstention, discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved.... Thus, ... there is little or no discretion to abstain in a case which does not meet traditional abstention requirements."
 
 
 25
 Mobil Oil Corp. v. City of Long Beach, 772 F.2d 534, 540 (9th Cir.1985) (quoting C-Y Development Co. v. City of Redlands, 703 F.2d 375, 377 (9th Cir.1983)). For example, we have found that a District Court exceeded its discretion in dismissing a case on the grounds of Colorado River abstention where we did not consider the circumstances "exceptional" and were not satisfied that the District Court had given sufficient weight to the heavy presumption favoring the exercise of jurisdiction. Corcoran, 807 F.2d at 41.
 
 
 26
 Bethphage's first complaint is with the District Court's reliance on the factors set forth in Hanlin. Bethphage suggests that Hanlin diverges from the traditionally strict Burford analysis used by the Supreme Court and by this Court. We disagree. Hanlin identified nearly all the factors that were relied upon in Supreme Court and Second Circuit Burford jurisprudence. The only factor from Burford that Hanlin does not include and which is not present in this case, is that in Burford Texas had created a centralized system of judicial review of commission orders, which "permit[ted] the state courts, like the Railroad Commission itself, to acquire a specialized knowledge" of the regulations and industry, Burford, 319 U.S. at 327, 63 S.Ct. at 1104. Clearly, this consolidation gave added weight to the argument that the state had a strong interest in unified decision-making with regard to its administrative scheme. This factor was also important in Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (right of statutory appeal concentrated in one circuit court reflected important state interest in unified decision-maker).
 
 
 27
 In this case there is no such consolidation of judicial review and, at the time of oral argument of this appeal, DMR had convened only two other rate appeal hearings. The first was resolved through negotiation, and the second was awaiting final decision by the Commissioner of Mental Retardation. Since state courts have had no opportunity to review the administrative determinations, it cannot be maintained that the federal courts lack a sophistication in these matters that the state courts have acquired. However, in affirming Hanlin, this Court evidently believed that the factors relied on to support Burford abstention were adequate. Every abstention case is to be decided upon its particular facts and not with recourse to some "mechanical checklist," Corcoran, 807 F.2d at 40 (quoting Moses H. Cone, 460 U.S. at 16, 103 S.Ct. at 937). Though the absence of consolidation of state court judicial review lessens the case for abstention, this factor has never been thought to be indispensable to Burford abstention.
 
 
 28
 Bethphage next contends that there is no remedy in state court for its aggrievement. As discussed above, the regulations promulgated by DMR provide for judicial review of DMR rate decisions in the Connecticut Superior Court. Despite the apparent benefit to Bethphage of the DMR judicial review regulation, Bethphage makes an elaborate argument that the state regulation is an unauthorized attempt to confer state court jurisdiction contrary to an exclusive arbitration remedy said to be required by Conn.Gen.Stat. § 17-311.
 
 
 29
 Bethphage acknowledges that the literal terms of section 17-311, set forth in the margin,[6] mandate binding arbitration only for appeals of rate decisions of the Commissioner of Income Maintenance, but it contends nevertheless that the statute must be understood to require binding arbitration for rate decisions of the Commissioner of Mental Retardation as well. Bethphage points out that prior to 1988, the Commissioner of Income Maintenance established both the room and board component and the service component of the rate. A 1988 amendment to section 17-313b shifted to the Commissioner of Mental Retardation the responsibility for setting the service component of the rate. See Conn.Pub.Act 88-71. Therefore, Bethphage argues, when section 17-311(b) authorizes a rehearing and arbitration procedure for "[a]ny institution or agency to which payments are to be made under sections 17-312 to 17-314, inclusive," it is necessarily applying its procedure to the decisions of the Commissioner of Mental Retardation concerning the service component of a rate pursuant to amended section 17-313b.
 
 
 30
 The argument is not trivial, but, until advised to the contrary by an authoritative decision of the Connecticut courts, we believe that the DMR is entitled to promulgate the regulation affording state court judicial review of DMR rate decisions. Read literally, section 17-311(b) subjects to binding arbitration only the room and board rate decisions of the Commissioner of Income Maintenance, leaving available for state court review, pursuant to the DMR regulation, the service rate decisions of the Commissioner of Mental Retardation. It is not so illogical to create different procedures for challenging the two components of the rate that we should reject the plain meaning of section 17-311(b) and assume that the Connecticut legislature, in amending section 17-313b, overlooked the reference in section 17-311(b) to the Commissioner of Income Maintenance and neglected to add the Commissioner of Mental Retardation to that section. DMR's regulation, providing for state court review of DMR rate decisions, is a reasonable implementation of the state statutory scheme and does not contradict the explicit terms of any state statute.
 
 
 31
 Indeed, it would be somewhat anomalous for a federal court to accept Bethphage's argument and invalidate the DMR regulation on state law grounds. This suit, even if nominally within federal court jurisdiction, presents matters that make Burford abstention in favor of state court resolution extremely appropriate, as the District Court ruled. It would be odd, to say the least, for a federal court to reach out to retain jurisdiction of such a suit by invalidating a state regulation that purports to accord the complainant his day in state court. We acknowledge the caution expressed in Moses H. Cone, 460 U.S. at 28, 103 S.Ct. at 943, that a federal court should not abstain if there is any "substantial doubt" that a state court can provide a prompt and complete resolution of the dispute. However, we are satisfied that the state regulation providing for judicial review is entirely clear and that its validity is sufficiently free from doubt to eliminate any obstacle to abstention.
 
 
 32
 Though we could certify to the Connecticut Supreme Court the issue of the regulation's validity, see C.R. Klewin, Inc. v. Flagship Properties, Inc., 936 F.2d 684 (2d Cir.1991); Conn.Gen.Stat. § 51-199a, we think that procedure is best used for obtaining an authoritative state law ruling that affects the merits of a federal law suit, and should be used sparingly, if at all, merely to resolve a threshold issue that concerns only whether the suit must proceed in federal court.[7] Rather than submit the challenge to the judicial review regulation directly to the Connecticut Supreme Court, we think the sounder procedure is to affirm the District Court's decision to abstain, permit the litigation to run its orderly course in the state courts, and afford Bethphage leave to return to federal court if the state courts should authoritatively rule that a state court remedy is unavailable. Cf. Moses H. Cone, 460 U.S. at 28, 103 S.Ct. at 943 ("It is highly questionable whether this Court would have approved a dismissal of a federal suit in Colorado River (or in any of the abstention cases) if the federal courts did not remain open to a dismissed plaintiff who later demonstrated the inadequacy of the state forum.") (citation omitted).
 
 
 33
 Bethphage next argues that "the mere existence of an intricate state-run administrative system does not require abstention." Brief for Appellant at 18. It is true that Burford does not require abstention whenever there exists a complex state administrative process, or even in all cases where there is a potential for conflict with state regulatory law or policy from federal litigation, but only where there would be "undue" federal interference. See New Orleans Public Service, Inc. v. New Orleans, 491 U.S. 350, 362, 109 S.Ct. 2506, 2514-15, 105 L.Ed.2d 298 (1989). But in this case, the District Court concluded that federal court exercise of jurisdiction would entail just the sort of undue interference that Burford seeks to avoid. We agree with Judge Nevas's assessment.
 
 
 34
 Bethphage next contends that the District Court erred in abstaining because federal courts have not hesitated in the past to exercise jurisdiction in provider suits brought under the federal Medicaid Act. However, as the defendants note, Bethphage does not cite to any case entertaining an individual provider challenge to the reasonableness of its own complex rate. Those cases that involved challenges to rates involved systemic challenges to the rate-setting methodology. The factors bearing on abstention would vary depending on whether the challenge was individual or systemic. Only in the case of individual challenges would a District Court be concerned about creating funding inequities and an incentive for forum shopping.
 
 
 35
 Finally, Bethphage claims that its complaint raises no questions of state law and that in the absence of unclear state laws the District Court may not abstain on Burford grounds. Bethphage argues that it "does not seek to involve the federal courts in construing state law" (Reply Brief for Appellant at 4), but simply asks that whatever the applicable state laws may be, the federal court should require the State to obey the federal Medicaid laws. However, in asking the Court for injunctive relief that would require the Court to set rates and impose terms in contracts between Bethphage and the defendants, appellant is necessarily raising questions of state law. Clearly the District Court cannot set rates without reference to the state statutes and regulations that establish how those rates are to be set. Furthermore, it does not appear that unclear state law is a prerequisite to Burford abstention. In New Orleans Public Service, 491 U.S. at 361, 109 S.Ct. at 2514, the Supreme Court stated that there are two separate situations when Burford abstention is appropriate:
 
 
 36
 Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."
 
 
 37
 Id. (quoting Colorado River, 424 U.S. at 814, 96 S.Ct. at 1245). This Court has also acknowledged the two separate instances where Burford abstention is called for. American Disposal Services, 839 F.2d at 87.
 
 
 38
 In sum, we conclude that the District Court properly applied the Burford doctrine and reasonably elected to abstain in this case.
 
 
 39
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 Bethphage contends that the crux of the funding dispute is the "unreasonable" wage reimbursement contemplated by DMR. The State contends that the alleged insufficiency of the funding rate arises from the six percent management fee paid by Bethphage and questioned by DMR. The State argues that the reduction in reimbursement need not be reflected by diminishing the services to clients but by cutting what amounts to an approximately half-million dollar management fee
 
 
 [2]
 A District Court may abstain (1) to avoid a decision of a federal constitutional question where the case may be disposed of on questions of state law, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); (2) in diversity cases because of unclear state law, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); (3) to avoid needless disruption of state efforts to establish a coherent policy in an area of comprehensive state regulation, Burford v. Sun Oil Co., supra; and (4) to ease the congestion of the federal court docket when a similar action is pending in state court, Colorado River Water Conservation District v. United States, supra. Moreover, under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, abstention is appropriate to avoid federal court interference with pending state "coercive" proceedings
 
 
 [3]
 The Court noted that in other cases in which Medicaid providers have challenged a state's funding mechanisms, the existence of a state-run administrative framework to formulate policy and decide cases has led courts to find Burford abstention appropriate. See Arden House, Inc. v. Heintz, 612 F.Supp. 81, 86 (D.Conn.1985); St. Joseph Hospital v. Electronic Data Systems Corp., 573 F.Supp. 443, 451-52 (S.D.Tex.1983)
 
 
 [4]
 In Levy, 635 F.2d at 963, this Court found it "highly significant" that a state administrative and regulatory scheme had been adopted pursuant to congressional authorization. Such authorization was found to constitute congressional recognition that the subject matter was of important state interest. Id. at 964
 
 
 [5]
 The Court in Obeda v. Connecticut Board of Registration for Professional Engineers & Land Surveyors, 570 F.Supp. 1007, 1013 (D.Conn.1983) (citation omitted) observed:
 Though no Connecticut cases on point have been found, it seems natural that "constitutional" includes the federal constitution. At any rate, state law does not "clearly bar[ ]" the federal claim.
 
 
 [6]
 The statute provides:
 Sec. 17-311. State payment to hospitals.
 (a) The commissioner of income maintenance shall establish annually the cost of services for which payment is to be made under the provisions of section 17-312. All hospitals receiving state aid shall submit their cost data under oath on forms approved by the commissioner. The commissioner may adopt, in accordance with the provisions of chapter 54, regulations concerning the submission of data by institutions and agencies to which payments are to be made under section 17-312, 17-313a, 17-313b....
 (b) Any institution or agency to which payments are to be made under sections 17-312 to 17-314, inclusive ... which is aggrieved by any decision of said commissioner may, within ten days after written notice thereof from the commissioner, obtain ... a rehearing on all items of aggrievement. Any such items not resolved at such rehearing to the satisfaction of such institution ... shall be submitted to binding arbitration to an arbitration board....
 Conn.Gen.Stat. 17-311 (emphasis added).
 
 
 [7]
 Our local rules provide that certification to the highest court of a state is appropriate to resolve an "unsettled and significant question of state law that will control the outcome of a case pending before this Court." 2d Cir.R. 0.27. The Connecticut certification statute provides, in pertinent part, that a "Court of Appeals of the United States" may certify "questions of law ... which may be determinative of the cause then pending ... and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of this state." Conn.Gen.Stat. § 51-199a(b)