### BETHPHAGE LUTHERAN SERVICE, INC.

v.

**Lowell P. WEICKER, Jr., in his official capacity as Governor of the State of Connecticut; Toni Richardson, in her official capacity as Commissioner of the Department of Mental Retardation of the State of Connecticut; and Audrey Rowe, in her official capacity as Commissioner of the Department of Income Maintenance of the State of Connecticut.**

Civ. No. 2:91CV00654 (AHN).

United States District Court,
D. Connecticut.

Nov. 1, 1991.

---

Richard P. Nelson, Nelson & Morris, Lincoln, Neb., Mark R. Kravitz, Rochelle S. Wood, Wiggin & Dana, New Haven, Conn., for plaintiff.

Kenneth A. Graham, Arnold I. Menchel, Peter P. Welch, Asst. Attys. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS

NEVAS, District Judge.

Bethphage Lutheran Service, Inc. ("Bethphage"), a Connecticut not-for-profit corporation, brings this action for preliminary and permanent injunctive relief and a declaratory judgment against Governor Lowell P. Weicker, Jr., Toni Richardson, the Commissioner of the Department of Mental Retardation, and Audrey Rowe, the Commissioner of the Department of Income Maintenance, ("the defendants") in their capacities as officials of the State of Connecticut. Bethphage contracts with the Connecticut Department of Mental Retardation ("DMR") to provide residential and day services to persons with mental retardation and other developmental disabilities. The services are funded jointly by the United States Department of Health and Human Services and the State of Connecticut. Bethphage contends that the defendants propose to fund Bethphage's 1991–92 fiscal year service contracts at a level that is inconsistent with the standards of efficiency, economy and quality of care mandated by statute. Specifically, Bethphage brings this action pursuant to 42 U.S.C. § 1983 ("section 1983"), claiming violations of (1) 42 U.S.C. § 1396a (a)(13)(A); (2) 42 U.S.C. § 1396a (a)(30)(A); (3) 42 U.S.C. § 1396a (a)(19); (4) 42 U.S.C. 1396n (c); (5) the right to equal protection under the fourteenth amendment; and (6) the right to due process under the fourteenth amendment. On August 23, 1991, the court held a hearing on the defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P. At the conclusion of the hearing the court informed the parties that it would issue a short order disposing of the motion and subsequently would issue a memorandum of decision. On August 26, 1991, the court granted the motion to dismiss. This memorandum articulates the basis of the August 26th order.

### I. *Background*

#### A. Medicaid

Title XIX of the Social Security Act is popularly know as the Medicaid Act, 42 U.S.C. § 1396 *et seq.* Medicaid is a cooperative federal-state program through which the federal government provides financial assistance to the states so that the states

may furnish medical, rehabilitation and other services to certain low-income persons. Although participation in Medicaid is voluntary, participating states must comply with certain requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of Health and Human Services ("the Secretary"). The Secretary customarily acts through the Health Care Finance Administration ("HCFA"). To qualify for federal assistance the Secretary must approve a State Plan for medical assistance, 42 U.S.C. § 1396a (a), that contains a comprehensive statement describing the nature and the scope of the state's program. 42 C.F.R. § 430.10 (1989). The plan must designate a single state agency to supervise or administer the State Plan. 42 U.S.C. § 1396a (a)(5).

Congress also has authorized persons with mental retardation or other developmental disabilities to receive Medicaid services in a community setting through passage of the Home and Community Based Services Waiver Act ("Waiver Act"). 42 U.S.C. § 1396n (c). The Waiver Act excuses states from satisfying all requirements of the Medicaid Act. To qualify for a waiver, a state must develop alternative regulatory schemes aimed at lowering the cost of medical assistance while at the same time maintaining the level of care. Although the Waiver Act authorizes the Secretary to waive certain requirements of the Medicaid Act it does not authorize the Secretary to waive any sections of the Medicaid Act governing the health, safety or welfare of Medicaid recipients. Indeed, the Secretary is not authorized to grant a waiver unless the state provides additional assurances that its waiver plan includes necessary safeguards to protect the health and welfare of individuals provided services under the waiver. 42 U.S.C. § 1396n (c)(2).

### B. State of Connecticut Implementation of the Waiver

Since July 1, 1987, the State of Connecticut has funded services for persons with mental retardation or other developmental disabilities under a waiver ("Connecticut Waiver"). The Connecticut Waiver was approved by HCFA and was amended to include day care services. Although the Connecticut Waiver was scheduled to expire on September 30, 1991, the defendants obtained temporary extensions. The Connecticut Waiver is administered by DMR.

### C. Standards and Protections

As part of the health and welfare assurances required by the Waiver Act, the defendants have incorporated by reference numerous standards and protections afforded Connecticut residents under state law. The assurances and standards incorporated include Conn.Gen.Stat. § 17a–238 (b), which provides that each person placed under the direction of the Commissioner of Mental Retardation shall be protected from harm and receive humane and dignified treatment adequate for his or her needs and for the development of his or her full potential at all times, and Conn.Gen.Stat. § 17a–227 (b), which requires that DMR regulations insure the comfort, safety, adequate medical care and treatment of persons with mental retardation or other developmental disabilities in residential facilities.

#### 1. *Reimbursement Procedure*

Waiver providers are reimbursed for residential and day program services by DMR pursuant to Conn.Gen.Stat. § 17–313b. Reimbursement for residential services is governed by Conn. Agencies Regs. § 17–313b–1 *et seq.* By contract and by regulation, day services are included in the same funding procedure. Conn. Agencies Regs. § 17–313b–3. The residential and day service contracts result from negotiations between DMR and the certified provider, here Bethphage. An operations plan ("OP") is incorporated into the signed contract. The OP is essentially a budget that estimates the provider's expenditures for the fiscal year. The OP is divided into three categories: program salary costs, program nonsalary costs, and administrative and general costs. The total estimated expenditures in the three categories become the total authorized expenditure for the contract year. Additionally, at the close of the contract year each provider prepares and files

an Audited Consolidated Operational Report ("ACOR"), which details actual expenditures. Conn. Agencies Regs. § 17–313b–8(1)(i). Incurred costs that exceed the contract amount are not reimbursed. Conversely, if the provider has spent less than the estimated cost for a category in the OP, the provider is required to return the difference to DMR. Conn. Agencies Regs. § 17–313b–8(1)(ii). Finally, excess costs of not more than 10% of a particular category can be funded from amounts not expended in another category.

### 2. *Negotiations for a New Contract*

Under the state regulations, negotiations for new provider contracts must be based upon information contained in the most recent ACOR, the provider's OP and other relevant information. Conn. Agencies Regs. § 17–313b–6(5).

### D. The Present Action

Bethphage is a charitable organization that is affiliated with the Evangelical Lutheran Church in America. Bethphage's mission is to provide services to mentally retarded and developmentally disabled persons. Bethphage currently serves approximately 154 mentally retarded and developmentally disabled persons. At all relevant times, Bethphage programs have been licensed by DMR and certified by the Department of Income Maintenance for participation as a Waiver Act provider.

Effective July 1, 1989, Bethphage entered into its first contracts with DMR to provide residential and day services to persons with mental retardation or other developmental disabilities. In the first year of operation, Bethphage instituted cost containment measures which, compared with

the previous provider, reduced costs on an annualized basis by $1,185,000. Nevertheless, Bethphage incurred a loss of more than $400,000 over the amount of funding initially approved for it by DMR. Accordingly, DMR made a supplemental grant of nearly $300,000 for the 1989–90 fiscal year, reducing Bethphage's operating loss to approximately $120,000.

The OP approved by DMR for fiscal year 1990–91 was in the original amount of $6,812,055. Several new programs were added to the OP during the year and the total DMR-approved fiscal 1990–91 OP was $7,139,422. If the new programs were annualized on the basis of the approved 1990–91 spending levels for those programs, the annualized OP for those services would be $7,371,960. During the 1990–91 fiscal year Bethphage instituted additional cost containment measures that resulted in a reduction in costs of approximately $69,000, compared with the previous year's costs. Again, Bethphage incurred an operating loss for the year, based upon unaudited figures, of approximately $220,000.[1] In spite of repeated requests by Bethphage, DMR refused to include in the fiscal year 1990–91 funding for the expenses covered by the fiscal year 1989–90 supplemental grant.

Bethphage appealed the fiscal year 1990–91 funding shortfall to DMR in March of 1991. On May 10, 1991, counsel for DMR and Bethphage held a pre-hearing conference. During the course of the next several months, counsel for DMR and Bethphage exchanged drafts of procedural stipulations for the appeal. At the time of the August 23, 1991 hearing before this court, no mutually agreed upon hearing date had been set by DMR.[2]

---

1. Specifically, Bethphage contends that the insufficiency of the funding rate arises in part because of what it terms "unreasonable" wage reimbursement. During the previous year, Bethphage compensated its direct care workers at an average wage of $9.47 per hour, while the DMR contract and OP provided reimbursement of only $8.71 per hour.

2. In a letter to Bethphage's counsel dated August 8, 1991, a deputy commissioner at DMR indicated that DMR would make "every effort to accommodate" the schedules of Bethphage's

counsel in order to expedite the hearing on the rates for fiscal years 1990–91 and 1991–92. (Mem. in Supp. of Def.'s Mot. to Dismiss, Ex. C).

It also bears noting that DMR has convened only two other rate appeal hearings. The first was resolved through negotiation after the Hearing Officer issued a report that represented a mutually satisfactory increase in funding to the aggrieved party. The second rate appeal is awaiting final decision by the Commissioner of Mental Retardation.

On July 16, 1991, DMR presented Bethphage with an "approved"[3] OP for fiscal year 1991-2. The "approved" OP provides for total authorized expenditures in the amount of $7,201,004—a decrease of (1) $170,956 from the 1990–91 OP on an annualized period, (2) $220,000 from 1990–91 spending levels, and (3) $3,144,731 from Bethphage's requested OP.

The central issue presented by this action is the proposed funding for the 1991–92 fiscal year. Bethphage argues that if it were to reduce the expenditures to the levels funded by the DMR proposed OP then the level of services would be substantially reduced. As a second consequence of reduced expenditures, the services reduction will place in jeopardy the health, safety and welfare of Bethphage's clients and its status as a licensed and certified provider of services.

Bethphage's primary contention is that the inadequacy of reimbursement levels violate a variety of statutory and constitutional rights. Bethphage seeks four forms of relief. First, it petitions the court to enter a declaratory judgment finding that the defendants' actions are unlawful and unconstitutional. Second, Bethphage seeks preliminary injunctive relief enjoining the defendants (1) from requiring Bethphage to accept the DMR-"approved" OP and contracts as a condition of funding; (2) to approve and fund the OP and services contracts from Bethphage at the annual level of spending approved by DMR in the fiscal year 1990–91, and annualized to reflect all program additions approved by DMR during that fiscal year, until the action can be determined on the merits; and (3) to approve and fund the OP services contract at the annual level of actual spending incurred by Bethphage in the 1990–91 fiscal year, annualized to reflect all program additions approved by DMR during that fiscal year. Third, Bethphage asks the court to permanently enjoin the defendants from violating a variety of Bethphage's statutory and constitutional rights. And fourth, Bethphage asks the court to permanently enjoin the defendants and require them to approve and fund the OP at the following levels: (1) at not less than 90% of the average wages and benefits funded by OPs for all community living arrangements and day services in Connecticut owned or operated by the State of Connecticut; (2) at not less than the levels reasonably expended by Bethphage in fiscal year 1990–91 for other necessary program services.

### Discussion

The defendants advance a host of arguments in support of their motion to dismiss.[4] Among these arguments, the defendants contend that the court should abstain from hearing this action pursuant to the abstention doctrine enunciated in *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Bethphage responds by arguing that *Burford* abstention is inappropriate because adequate administrative review is not available. The court agrees with the defendants that *Burford* abstention is appropriate and thus does not address the merits of the defendants' other contentions.

### A. The Burford Doctrine

■ The court recognizes that it has a "virtually unflagging obligation ... to exercise jurisdiction given [to it]", *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18, 96 S.Ct. 1236, 1246–47, 47 L.Ed.2d 483 (1976). Nevertheless, in certain exceptional circumstances the court can decline to exercise jurisdiction that is constitutionally vested in it by Congress. Indeed, "[p]ragmatic considerations of judicial efficiency, as well as reasons of comity between federal and state courts", *Hanlin Group v. Power Authori-*

---

**3.** The court places the word approved in quotation marks because the 1991–92 OP does not appear to be the product of bona fide negotiations between the parties, i.e., it appears to be the result of the unilateral action of DMR.

**4.** *E.g.,* the complaint has not alleged the personal involvement of Governor Weicker or Commissioner Rowe and thus must be dismissed as to them; Bethphage has no legally enforceable rights under 42 U.S.C. § 1396a (a)(13)(A) (the Boren Amendment); the eleventh amendment bars the action; Bethphage has no standing.

*ty of State of the State of New York,* 703 F.Supp. 305, 307 (S.D.N.Y.1989), *aff'd,* 923 F.2d 844 (2d Cir.1990), have led the Supreme Court to fashion several abstention doctrines.[5]

The Supreme Court has characterized *Burford* abstention as appropriate where the

> exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244.[6] The Second Circuit has held that the aim of *Burford* abstention is to "avoid resolving difficult state law issues involving important public policies or avoid interfering with state efforts to maintain a coherent policy in an area of comprehensive regulation or administration." *American Disposal Services, Inc. v. O'Brien,* 839 F.2d 84, 87 (2d Cir.1988). *See also Corcoran v. Ardra Ins. Co.,* 842 F.2d 31, 37 (2d Cir.1988). Essentially, the court properly may invoke the abstention doctrine "when a state has established an administrative framework to formulate policy and decide cases in an area of legitimate state interest." *Arden House, Inc. v. Heintz,* 612 F.Supp. 81, 86 (D.Conn.1985).

**B. Applying Burford**

■ When deciding whether to invoke *Burford* abstention the court should focus on the underlying rationale of administrative abstention. *Hanlin,* 703 F.Supp. at 308. Courts evaluating the wisdom of abstaining under *Burford* have concentrated upon the following factors, although no single factor is dispositive: the degree of specificity of the state regulatory scheme,

the necessity of discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern. *Id.*

**1. Specificity of Regulatory Scheme**

The first issue is whether the State of Connecticut provides an extensive state regulatory scheme to administer the Medicaid program under which Bethphage is a provider. The court notes that the Medicaid Act establishes a "cooperative state-federal program wherein the states actually administer and oversee the payment of benefits and related matters." *St. Joseph Hospital v. Electronic Data Systems Corp.,* 573 F.Supp. 443, 451-2 (S.D.Texas 1983). Furthermore, in other cases in which Medicaid providers have challenged a state's funding mechanisms, the mere existence of a state-run administrative framework to formulate policy and decide cases has been deemed a sufficient basis for *Burford* abstention. *See Arden House, Inc. v. Heintz,* 612 F.Supp. 81, 86 (D.Conn.1985); *St. Joseph,* 573 F.Supp. at 451-52.

Here, there are strong state efforts to maintain a coherent policy in an area of comprehensive administration. Bethphage challenges the overall reimbursement rate and the method and rationale by which the reimbursement rate was determined. The reimbursement rate is established pursuant to Conn.Gen.Stats. § 17–313b and §§ 17–313b–1 through 17–313b–18 of the Regulations of Connecticut State Agencies ("the Regulations").

Section 17–313b (a), Conn.Gen.Stats., provides in relevant part:

**5.** A district court may abstain (1) to avoid a decision of a federal constitutional question where the case may be disposed of on questions of state law, *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); (2) in diversity cases because of unclear state law, *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); (3) to avoid needless conflict with state administrative procedures, *Burford,* 319 U.S. 315 at 327, 63 S.Ct. 1098 at 1104; and (4) to ease the congestion of the federal court docket when a similar action is pending in state court,

*Colorado River. See generally,* Chemerinsky, *Federal Jurisdiction* §§ 12.1–12.3 (1989); Redish, *Federal Jurisdiction: Tensions in the Allocation of Judicial Power,* 281–298 (2d ed. 1990); Wright, Miller & Cooper, 17A *Federal Practice and Procedure* § 4241 (1988 & Supp.1991).

**6.** Or, as Justice Brennan stated in *Allegheny County v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), the goal of *Burford* abstention is to not "disrupt a state administrative process."

The service component of the rates to be paid by the state to private facilities and facilities operated by regional education service centers which are licensed to provide residential care pursuant to section 17a–227, but not certified to participate in the Title XIX Medicaid programs as intermediate care facilities for persons with mental retardation, shall be determined annually by the commissioner of mental retardation.

In order to satisfy the duty set forth in section 17–313b (a), the Commissioner of Mental Retardation has adopted Regulations. Conn.Gen.Stats. § 17–313b (b). These Regulations govern, substantively and procedurally, the determination of rates and the inclusion of particular costs. Furthermore, section 17–313b–8 of the Regulations sets forth both the procedure for negotiating the service rates and the avenue to pursue should negotiations not produce agreement. Other sections of the regulations provide for the calculation of rates for new facilities, audits, reporting requirements, and the circumstances under which a facility may obtain additional payments through temporary service supplements to the service rate.

Section 17–313b–18 of the Regulations provides in relevant part:

> Any organization which is aggrieved by any rate decision pursuant to these regulations by the Commissioner of Income Maintenance or the Commissioner of Mental Retardation may, within ten days after written notice thereof from the commissioner issuing the decision obtain by written request from the commissioner issuing the decision a hearing on all items of aggrievement.... Hearings and all subsequent appeals therefrom before the Commissioner of Mental Retardation shall be conducted in accordance with the procedures specified in Sections 19–570–1 through 19–570–60 of the Regulations of Connecticut State Agencies.

The administrative decision is then subject to appeal to state superior court and, ultimately, the state supreme court, pursuant to Conn.Gen.Stats. § 4–183, a section of the Uniform Administrative Procedure Act ("UPA"). Indeed, the superior court may reverse an agency determination that is "in violation of constitutional or statutory provisions." *Id.*[7] It bears noting that the procedures required by the UPA exceed the minimal procedural safeguards mandated by the due process clause of the federal and state constitutions. *Neyland v. Board of Education*, 195 Conn. 174, 183, 487 A.2d 181 (1985); *Leib v. Board of Examiners for Nursing*, 177 Conn. 78, 82–83, 411 A.2d 42 (1979); *Taylor v. Robinson*, 171 Conn. 691, 698–99, 372 A.2d 102 (1976).

Finally, sections 17a–231 through 17a–237 provide the Commissioner of Mental Retardation with the authority to obtain a state court appointed receiver to protect the health and welfare of the residents of facilities if there are substantial violations of the licensure requirements or if a facility intends to close without making adequate arrangements for its patients.

Thus, state law provides a comprehensive statutory framework to formulate policy and decide cases, including opportunities for state court review. The breadth and degree of specificity of these statutes suggests that abstention is appropriate.

### 2. *Necessity for Discretionary Interpretation*

The second issue is whether the state statutes contain broad terms that properly should be interpreted by a state agency and the experts in a particular field. In *Burford*, the Supreme Court observed that if a statutory standard lends itself to variation in its application, litigation regarding the statute should not be entertained in federal court. This prescription stems from a desire to prevent "conflicts in the interpretation of the state law, dangerous

---

7. The court in *Obeda v. Connecticut Bd. of Reg. for, Professional Eng'rs.*, 570 F.Supp. 1007, 1013 (D.Conn.1983) observed:

Though no Connectucut cases on point have been found, it seems natural that 'constitutional' includes the federal constitution. At any rate, state law does not 'clearly bar [ ]' the federal claim.

to the success of state policies." *Burford,* 319 U.S. at 334, 63 S.Ct. at 1107.

Here, in order to comply with the health and welfare assurances required by the Waiver Act, the defendants have incorporated by reference numerous standards and protections afforded Connecticut residents under state law.[8] Furthermore, under the Waiver Act the Secretary is not authorized to waive any sections of the Medicaid Act governing the health, safety or welfare of Medicaid recipients.[9]

Furthermore, the statutory framework at issue necessarily invokes the expertise and best judgment of the Commissioner of Mental Retardation and does not lend itself to consistent judicial interpretation. It is significant that reasonable persons can disagree as to what constitutes reasonable payments for necessary services under the Waiver Act. Certainly this court could establish reimbursement rates either above or below those determined in state court. As the court in *Hanlin* noted, "This [absence of consistency] would create a divisive reimbursement rate in which providers with substantially the same needs are reimbursed at different rates, encouraging plaintiffs to forum shop." *Hanlin,* 703 F.Supp. at 309. Therefore, "proper respect for the expertise of state officials and the expeditious and evenhanded administration of [the] state program[] counsels restraint", *Levy v. Lewis,* 635 F.2d 960, 964 (2d Cir.1980), and suggests that *Burford* abstention is appropriate.

3. *Subject Matter of State Concern*

Finally, abstention under *Burford* is appropriate because the subject matter of this case—reimbursement rates under the Medicaid Act—is an area of legitimate state interest. *See Arden House,* 612 F.Supp. at 86.

Bethphage claims its rights under the Medicaid Act have been violated. Yet Bethphage's claims more realistically arise under the Connecticut regulatory scheme that establishes reimbursement rates. This is so because the Medicaid Act requires the creation of a state administrative framework to establish methods and procedures related to the utilization of and payment for care and services available under the plan "to ... assure that payments are consistent with efficiency, economy and quality of care." Thus, Congress has recognized that the establishment and review of reimbursement rates is a legitimate state concern.

In sum, were the court to exercise jurisdiction here, essentially it would be drawn into the complex process of establishing reimbursement rates. And this seems to be an area that *Burford* abstention intended to relegate to state adjudication. *Hanlin,* 703 F.Supp. at 310.

C. Availability of State Remedy

Each of the above factors suggest that *Burford* abstention is appropriate. Even so, the court is not free to abstain unless there is an adequate state remedy available to Bethphage. *Hanlin,* 703 F.Supp. at 310. Here, an adequate state remedy exists. Bethphage claims that the administrative process—at best—permits tinkering with only portions of the rate, and thus cannot offer them the forms of relief requested in the complaint. The court disagrees. Section 17–313b–18 of the Regulations provides that "any organization which is aggrieved by *any* rate decision pursuant to these regulations ... may obtain ... a hearing on *all* items of aggrievement." (emphasis supplied). The terms "any" and "all" certainly provide for administrative review of both line-item and systemic challenges to reimbursement rates. Further-

---

8. Thus, all persons placed under the direction of the Commissioner of Mental Retardation shall be protected from harm and receive humane and dignified treatment adequate for their needs and for the development of their full potential at all times, Conn.Gen.Stat. § 17a–238 (b), and DMR regulations must provide for their comfort, safety and adequate medical care. Conn.Gen.Stat. § 17a–227 (b).

9. For example, Connecticut must administer the State Plan in the best interests of recipients, 42 U.S.C. § 1396a (a)(19), and assure that payments are consistent with efficiency, economy and quality of care. 42 U.S.C. § 1396a (a)(30)(A).

more, as noted above, the administrative decision is subject to an appeal to the superior court under Conn.Gen.Stats. § 4–183. Ultimately, Bethphage could appeal the superior court decision to the state supreme court. Accordingly, Bethphage is not precluded from pursuing an adequate state remedy.

### Conclusion

For the foregoing reasons, the court abstains from hearing this matter and dismisses the complaint. The court has balanced Bethphage's choice of forum against the importance of maintaining a harmonious relationship between the state and federal governments. Consequently, the court concludes that it will "refrain from becoming involved with state policy making and enforcement procedures in [a] complex area[ ] ... which [is] primarily the state's concern." *Society for the Good Will to Retarded Children v. Cuomo,* 652 F.Supp. 515, 523 (E.D.N.Y.1987).