**OSTEOPATHIC HOSPITAL FOUNDERS ASSOCIATION, INC., d/b/a Tulsa Regional Medical Center, Plaintiff,**

v.

**Garth L. SPLINTER, M.D., Chief Executive Officer and Charles Ed McFall, Chairman of Oklahoma Health Care Authority, Defendants.**

No. 93–C–869–H.

United States District Court, N.D. Oklahoma.

Nov. 1, 1996.

Kenneth Crump, Jr., James C. Shaw, Laura L. Cross, Miller Dollarhide Dawson, Tulsa, OK, for plaintiff.

Howard J. Pallotta, General Counsel, Oklahoma City, OK, for defendants.

---

### ORDER

HOLMES, District Judge.

This matter comes before the Court on a motion for summary judgment by Defendants Garth L. Splinter, M.D. and Charles Ed McFall (Docket # 67) and on a motion to assess security bond or, in the alternative, to modify temporary injunctive order by Defendants (Docket # 74).

In 1993, the Oklahoma Department of Human Services ("DHS"), the predecessor to Oklahoma Health Care Authority ("OHCA"), claimed that it had overpaid Tulsa Regional Medical Center ("TRMC") under the Oklahoma State Medicaid Program (the "Oklahoma Plan") for services provided by TRMC to indigent patients. DHS alleged that the overpayment occurred because TRMC had incorrectly reported the number of Medicaid patient days during 1991, and that, based upon that information, DHS had deemed TRMC to qualify for disproportionate share payments ("DSH" payments). DSH payments are made to hospitals that either serve a disproportionately high number of Medicaid clients or provide a disproportionately high amount of charity care. DHS contend-ed that TRMC was paid, from July 1, 1992 through May 27, 1993, the highest amount of disproportionate share adjustment possible because it was deemed qualified under one of two formulas that provided for such payment adjustments. DHS alleged that if TRMC had not reported the patient days as it had, it would only have received payments under the formula providing for lesser adjustments.

DHS sought to recoup the alleged overpayments through offsets against future payments owed to TRMC for providing services to indigent patients. In response, TRMC filed this lawsuit on September 24, 1993, seeking injunctive relief to prevent these offsets. In its amended complaint, TRMC asserts that Defendants' determination of the reimbursement rate due Plaintiff under the Oklahoma Plan violates the Medicaid Act and that it is entitled to a declaratory judgment that TRMC qualified for DSH adjustments and a permanent injunction prohibiting Defendants from offsetting future payments or attempting to enforce the Oklahoma Plan.

On December 1, 1993, the Court held a hearing in which evidence was presented regarding the Plaintiff's motion for a preliminary injunction. The parties agreed to maintain the status quo pending the decision. By order dated August 23, 1994, the Court entered its findings of fact and conclusions of law, granting TRMC's request for a preliminary injunction. The Court found that Plaintiff sufficiently established that the proposed offsets would irreparably harm it and that the injury to its interests would outweigh whatever damage the injunction might cause Defendants. The Court further determined that the issuance of an injunction was not adverse to the public interest and that Plaintiff had shown some probability of success on the merits.[1]

The instant summary judgment motion, if granted, would conclude this litigation.

### I.

Summary judgment is appropriate where "there is no genuine issue as to any material

---

1. On September 1, 1994, Defendants requested the Court to put into place a bond or otherwise secure the amount in dispute. By minute order on February 17, 1995, the Court denied Defendants' motion on the condition that they could reurge the motion upon any indication of financial difficulty on behalf of the hospital.

fact," *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Windon Third Oil & Gas Drilling Partnership v. Federal Deposit Insurance Corp.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and "the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c). In *Celotex,* the Supreme Court stated:

> [t]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322, 106 S.Ct. at 2552.

A party opposing a properly supported motion for summary judgment must offer evidence, in admissible form, of specific facts, Fed.R.Civ.P. 56(e), sufficient to raise a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510.

Summary judgment is only appropriate if "there is [not] sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250, 106 S.Ct. at 2511. The Supreme Court stated: "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. Thus, to defeat a summary judgment motion, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Boren v. Southwestern Bell Tel. Co.,* 933 F.2d 891, 892 (10th Cir. 1991).

## II.

The Court has determined that the following facts are uncontroverted for purposes of resolving the instant motion for summary judgment.

1. TRMC is an Oklahoma non-profit corporation providing health care services in Tulsa, in the Northern District of Oklahoma, to patients eligible to receive Medicaid reimbursement for those services pursuant to Title XIX of the Social Security Act (42 U.S.C. § 1396 *et seq.*), commonly known as the Medicaid Act (the "Act").

2. The Defendants, Dr. Garth L. Splinter and Charles Ed McFall (the former Chairman of the OHCA Board), are state officials responsible for the administration of the Act. As part of the administration of the Act, the Defendants are responsible for carrying out the provisions of the Oklahoma State Title XIX Medicaid Plan (the "Oklahoma Plan").

3. The Oklahoma Plan is a cooperative federal-state program established pursuant to the Act for the purpose of enabling the state of Oklahoma to furnish medical assistance to aged, blind, or disabled individuals, or members of families with dependent children, whose income and resources are insufficient to meet the costs of necessary medical services.

4. The federal government and Oklahoma share the costs of such aid. Approximately 70% of the cost of each dollar is borne by the federal government and 30% is borne by Oklahoma.

5. Under the Oklahoma Plan, DHS makes payment adjustments to provide additional payments to certain hospitals that service a disproportionate number of low-income patients.

6. TRMC is a Disproportionate Share Hospital and has received Disproportionate Share Adjustments from DHS.

7. On October 1, 1990, the State Medicaid Agency established a new methodology of payment for hospitals in Oklahoma. This new methodology was used to pay the Plaintiff hospital during the years 1992 and 1993. The reimbursement methodology is set out in the OHCA's promulgated rules found at OAC (Oklahoma Administrative Code) 317:3–5–47.

8. The reimbursement methodology used since October 1, 1990 by DHS and OHCA has four major components which are additive components used to set prospective per diem rates.[2] These components are the level of care per diem, plus the fixed capital per diem, a direct medical education per diem, and a disproportionate share add-on. With respect to the level of care per diem, there are eight levels of care which are reimbursed: routine care, intensive care, psychiatric care, rehabilitation care, surgical care, maternity care, neonatal intensive care, and burn care.

9. The reimbursement methodology was established using the aggregate data from all hospitals in Oklahoma. The aggregate data included all hospital cost reports from 1989, paid claims history from all hospitals in 1989, and a capital data base. The use of aggregate data from the Oklahoma Hospital industry allowed the Medicaid agency to establish rates that, in the aggregate, covered costs at the median in 1991 of 96.3% of all costs. The use of aggregate data from the Oklahoma hospital industry allowed the Medicaid agency to establish rates that, in the aggregate, covered costs at the mean in 1991 of 101.1% of all costs.

10. Despite the system's design in the aggregate, each Oklahoma hospital's rate, like the Plaintiff's, is set individually on the basis of its own cost report in the base year.

11. Disproportionate share payments are payments made to eligible hospitals in Oklahoma which serve either an unusually high amount of Medicaid patients or many low-income patients. These payments are made in addition to the "base rate." As of May, 1993, of the approximately 130 hospitals participating in the Oklahoma Medicaid program, only 29 Oklahoma hospitals receive disproportionate share payments.

12. Under the Oklahoma Plan, there are two tests under which a hospital qualifies to receive Disproportionate Share Adjustments: (a) if its Medicaid inpatient utilization rate is at least one standard deviation above the mean Medicaid inpatient utilization rate for hospitals receiving Medicaid payments in the state (the "Medicaid Test") or (b) if the hospital's low-income utilization rate exceeds 25% (the "Low–Income Test"). *See also* 42 U.S.C. § 1396r–4(b)(1).

13. The Oklahoma Plan provides for different minimum Disproportionate Share Adjustments depending upon whether the hospital qualifies as a Disproportionate Share Hospital under the Medicaid Test or the Low–Income Test. Hospitals qualifying under the Low–Income Test receive a smaller minimum adjustment.

14. As of May, 1993, of the 29 hospitals receiving disproportionate share payments, 20 hospitals were eligible for such payments under the Medicaid Inpatient Utilization test and the remaining 9 were eligible under the Low–Income Utilization test.

15. DHS examines a hospital's eligibility under the Medicaid Utilization test by reviewing a hospital's Medicare cost report in the spring of the year. Once eligibility is established, an additional payment is made to the hospital. Under the Oklahoma Medicaid State Plan effective July 1, 1992 (or state fiscal year 1993), these payment adjustments varied depending on which eligibility test a hospital was qualified to use.

---

**2.** A prospective per diem rate is a rate which is set each June 30th to be applicable to hospitals' services performed for Medicaid patients between July 1 and June 30th of the next year. The rate for each hospital is individually set each year for all eight levels of care.

16. On July 1, 1992, the payment adjustment for a DSH hospital eligible under the Medicaid Inpatient Utilization Test varied according to bed size, location of the hospital (urban/rural), and proportion of Medicaid services utilized when compared to other Oklahoma hospitals.

17. On July 1, 1992, the payment adjustment for a DSH hospital eligible under the Low–Income Utilization Test began with a 4% add on with a .25% increase for every additional 10% increase in low income utilization. The payment adjustment under the Low–Income Utilization Test also increased as the hospital provided more services to low income persons.

18. During 1992 and 1993, the State's payment adjustment for hospitals which qualified under the Medicaid Inpatient Utilization Test was a larger payment adjustment than for those hospitals who qualified under the Low–Income Utilization Test.

19. In early 1992, the Plaintiff hospital filed a Medicare cost report. Based upon TRMC's filed Medicare cost report, DHS made TRMC eligible under the Medicaid Inpatient Utilization test on July 1, 1992. Based upon the cost report, TRMC showed that they had served 35,964 patients out of 99,000 total patients served. This gave TRMC a Medicaid percentage of approximately 36%. One standard deviation above the mean for state fiscal year 1993 (beginning July 1, 1992) was 35%. Based upon this cost reporting information, DHS gave TRMC a disproportionate share payment as a Medicaid Utilization hospital for an entire year.

20. TRMC received a 24.92% add-on to every payment they received from DHS during the year from July 1, 1992 through June 30, 1993.

21. The 12,933 patient days included in the 1991 Medicare Cost Report were all attributable to low-income patients. Of those 12,933 days, 4,612 were attributable to patients considered to be Medicaid-eligible.

22. When the 12,933 days were included on the Medicare Cost Report, TRMC was not aware how it would be used to determine TRMC's disproportionate share status. TRMC included those days on the Medicare Cost Report because it interpreted the report as seeking the number of patient days paid by the state for care of low-income patients.

23. Based upon a survey sent out by DHS, TRMC later reported only 23,031 Medicaid days of 93,236 total days. The survey was received in January, 1993—halfway through the state fiscal year. TRMC interpreted the survey to be seeking information regarding numbers of paid or provided and allowed Medicaid days and that specific information was provided. Therefore, some of the low-income patient days previously reported under the Medicare Cost Report were not reported there. Based upon the survey results, Defendants contend that the earlier cost report filed by Plaintiff incorrectly aggregated Medicaid patient days with Oklahoma Department of Health patient days. Plaintiff, however, denies any intentional misstatement in the incorrect figures. Defendants determined that Plaintiff was no longer eligible under the Medicaid inpatient utilization test.

24. Under the appeal rules for hospital reimbursement, there are very complex requirements for Request for Exception, which is a specific standard that must be met by the hospital making the request. A hospital must show that the Medicaid rates paid did not allow the hospital to meet its marginal costs.

25. Under the appeal rules for hospital reimbursement, a rate appeal must be filed by the hospital within 30 days of receiving notification of its yearly rate. Since the inception of the new hospital reimbursement methodology in 1990, there have been 10 appeals. Of these 10 hospital appeals, two appeals were granted, six appeals were denied, and two hospitals failed to prosecute their rate appeal.

26. By letter dated May 27, 1993, Mr. Haddock of the Medicaid agency, advised Mr. Steichen, Plaintiff's Reimbursement Manager, that Plaintiff was not eligible for DSH and should return $1,923,246.11 in DSH that it had erroneously received.

27. On June 23, 1993, TRMC appealed the Medicaid agency's determination of a

DSH overpayment and requested a sixty day extension of the appeal.

28. On August 26, 1993, the State found that the hospital did qualify under the low-income test. The payment rate under this second test was substantially different under the Oklahoma Plan. Therefore, the State concluded that an overpayment still existed in the amount of $1,677,000.00.

29. Defendants contend that TRMC qualifies as a Disproportionate Share Hospital under the Low Income Test but not under the Medicaid Test and that, consequently, TRMC is entitled only to a payment adjustment of 4% effective July 1, 1992 and 2% effective January 1, 1993 (at which time the Oklahoma Plan was amended to reduce the Disproportionate Share Adjustment percentages) under the Low Income Test, instead of 24.92% and 12.46% respectively under the Medicaid Test.

30. On August 26, 1993, Defendants advised TRMC that, on September 26, 1993, Defendants would begin offsetting future payments to TRMC in order to recover the amounts allegedly overpaid. To date, approximately $320,000.00 owed for services actually provided by TRMC has been withheld by Defendants.

31. Defendants have advised Plaintiff that Disproportionate Share Adjustment percentages established under the Oklahoma Plan may not be administratively appealed.

32. Plaintiffs contend that the payments by Defendants to Plaintiff under the Oklahoma Plan, and the proposed offsets, violate the Boren Amendment to the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A), which mandates a state plan setting payment rates "which the State finds, and makes assurances to the Secretary [of Health and Human Services],

are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards...." The specific violations alleged in the amended complaint are that the Oklahoma Plan does not provide reimbursement rates adequate to permit TRMC to meet its reasonable costs, that the Plan discriminates against TRMC which qualifies under the Low–Income Test but not the Medicaid Test, and that the amendments to the Oklahoma Plan reducing payment percentages were not supported by necessary findings and were promulgated arbitrarily. Defendants contend that the treatment of TRMC under the Oklahoma Plan complies with the Act.

33. TRMC contends that it lost approximately $660,000.00 from providing services to Medicaid patients during the time DHS alleges TRMC was overpaid. Defendants note that generally accepted accounting principles were not used in this determination.

34. The budget of DHS for the Oklahoma Plan is in excess of $1 billion dollars. Total revenues for TRMC in 1992 were approximately $137 million dollars. However, less than 10% of this amount was from DHS payments.

35. Disproportionate Share payments are made in addition to the "base rate" paid to hospitals under Medicaid.

### III.

■ Plaintiff alleges that, pursuant to 42 U.S.C. § 1983, Defendants have violated both the substantive and the procedural components of the Boren Amendment, *see* 42 U.S.C. § 1396a(a)(13)(A).[3] The substantive

---

3. In the third amended complaint filed on February 21, 1995, Plaintiff alleges that:

The Oklahoma Plan does not comply with the Act in that it does not provide for reimbursement rates adequate to compensate TRMC and allow it to meet its reasonable costs. In fact, during the period of time TRMC was allegedly overpaid, it lost in excess of $666,000.00 by providing services to Medicaid patients under the Oklahoma Plan, even after receiving the $1,677,693.94 that DHS alleged had been overpaid.

Moreover, the Oklahoma Plan violates the Act because it provides for Disproportionate Share Adjustments that discriminate against certain Disproportionate Share Hospitals based upon whether they qualify under the Medicaid Test or Low Income Test.

Furthermore, the amendments to the Oklahoma Plan to reduce Disproportionate Share Adjustment percentages were not supported by necessary findings and were promulgated arbitrarily.

component of the Boren Amendment gives health care providers an enforceable right "to the adoption of reimbursement rates that are reasonable and adequate to meet the costs of an efficiently and economically operated facility that provides care to Medicaid patients." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509–10, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). In its response to Defendants' motion, Plaintiff states that "TRMC is alleging OHCA is substantively in violation of the Boren Amendment because of a systemic pattern of inadequate reimbursement and a lack of adequate findings under the Oklahoma Plan." Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Response") at 22. Defendants assert that Plaintiff has not pled the existence of a systemic problem; rather, the allegations focus solely on the adequacy of the reimbursements made to Plaintiff. A careful review of the third amended complaint makes clear that the gravamen of Plaintiff's action is the allegedly inadequate reimbursement rate applied to TRMC under the Oklahoma Plan.

The third amended complaint asserts three claims for relief. Plaintiff's first claim is that "the Oklahoma Plan does not comply with the Act in that it does not provide for reimbursement rates adequate to compensate TRMC and allow it to meet its reasonable costs." As relief, Plaintiff requests that "the Court declare that the Oklahoma Plan was, at the time of DHS's alleged overpayments, and is now in violation of the Act, and that Defendants be required to promulgate a new state plan providing reimbursement rates and Disproportionate Share Adjustment percentages that comply with the Act." TRMC further requests "that Defendants be required, in the interim, to reimburse TRMC at rates adequate to meet its reasonable costs."

Plaintiff's second claim is that "TRMC is entitled to a declaration that it qualified for Disproportionate Share Payments under the Medicaid Low–Income Utilization Test and that, consequently, it was not overpaid." Accordingly, TRMC requests a declaratory judgment "that it qualified for Disproportionate Share Payments under the Medicaid Low–Income Utilization test pursuant to 42 U.S.C. § 1396r–4 and that it was not overpaid by DHS."

Plaintiff's third claim for relief requests that "the Court permanently enjoin defendants from offsetting future payments to TRMC to recover the alleged overpayments or from otherwise attempting to enforce the unlawful Oklahoma Plan."

Notwithstanding these clear statements, Plaintiff's response brief to Defendants' motion for summary judgment now asserts that:

TRMC is challenging the methodology the State used in determining its Disproportionate Share Payment Scheme and Base Rates, which is a systemic challenge alleging the State violated federal statutes in developing its reimbursement system and that, in doing so, it had an adverse effect on many hospitals operating under the Oklahoma Plan.

The Court, however, declines to accept this characterization of Plaintiff's claims. Rather, the actual allegations contained in the third amended complaint should control the instant motions. The Court finds that the third amended complaint does not allege a systemic problem, but instead claims that the reimbursements made to Plaintiff under the Oklahoma Plan were incorrect.

### IV.

■ Defendants' first argument is that this Court should decline to rule on Plaintiff's Boren Amendment claims based upon the abstention doctrine established by the United States Supreme Court in *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The Tenth Circuit has stated:

It is recognized by all courts that: "Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court

would clearly serve an important countervailing interest.'"

*Grimes v. Crown Life Ins. Co.,* 857 F.2d 699, 703 (10th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 934 (1989) (quoting *Moses H. Cone Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 14, 103 S.Ct. 927, 936, 74 L.Ed.2d 765 (1983)). In *Burford,* the Supreme Court held abstention to be appropriate where questions of state law are unclear and there is a need for centralized state administration of the issue in question. *Burford,* 319 U.S. at 327–28, 63 S.Ct. at 1104; *see also* Erwin Chemerinsky, *Federal Jurisdiction* 703 (1994). The Supreme Court has characterized *Burford* abstention as proper where:

> there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar.... In some cases, however, the state question itself need not be determinative of state policy. It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244–45, 47 L.Ed.2d 483 (1976). The Supreme Court has further held that *Burford* abstention is appropriate only where federal court jurisdiction over "the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern," *New Orleans Pub. Service, Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989), or where there is a danger that federal court review "would disrupt the State's attempt to ensure

uniformity in the treatment of an essentially local problem." *Id.* at 362, 109 S.Ct. at 2515. Thus, a court should abstain under *Burford* where the administrative system in question has a primary purpose of achieving uniformity within a state and there is a danger that federal court review would undermine the desired uniformity. *See* Chemerinsky at 706.

The Tenth Circuit has not addressed the issue of *Burford* abstention in the context of state administered Medicaid reimbursement plans. In *Grimes,* the Tenth Circuit held that the district court should have abstained under *Burford* in a case involving the rights of an insolvent insurer under the McCarran–Ferguson Act, 15 U.S.C. § 1011, and the Oklahoma statutory scheme for resolving insurer insolvency. *Grimes,* 857 F.2d at 700–03.[4] The Court stated that the formulation of "comprehensive schemes for insurance regulation and liquidation" by the states do not deprive the federal courts of jurisdiction as a general matter. *Id.* at 704. Following *Burford* and its progeny, however, the Court provided a four factor analysis to determine whether abstention would be warranted in the exceptional case:

> (1) whether the suit is based on a cause of action which is exclusively federal ...; (2) whether the suit requires the court to determine issues which are directly relevant to the liquidation proceeding or state policy in the regulation of the insurance industry ...; (3) whether state procedures indicate a desire to create special state forums to regulate and adjudicate these issues ...; and, (4) whether difficult or unusual state laws are at issue.

*Id.* at 704–05 (citations omitted). Applying these four factors, the Tenth Circuit concluded that *Burford* abstention was warranted and reversed and remanded the case with

---

**4.** The McCarran–Ferguson Act is a federal mandate devolving to the states authority over the regulation and taxation of the "business of insurance." *Grimes,* 857 F.2d at 702 n. 3. The Tenth Circuit stated that the act was relevant to the case

> because it encourages the states to formulate their own systems to regulate insurers doing business in their states. Therefore, in instances where states have responded to this con-

gressional policy by formulating complex and specialized administrative and judicial schemes to regulate insurers ... it becomes increasingly possible that the exercise by a federal court of its jurisdiction will prove to be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Id.* at 703 (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245).

instructions that it be remanded to the District Court of Oklahoma County. *Id.* at 707.[5]

In *Bethphage Lutheran Serv., Inc. v. Weicker,* the Second Circuit undertook a similar analysis in an action seeking to enjoin Connecticut officials' proposed payments under the Medicaid Act. 965 F.2d 1239, 1242 (2d Cir.1992). In that case, the district court below

> looked to three factors in determining that the instant case was appropriate for *Burford* abstention ...: "the degree of specificity of the state regulatory scheme, the necessity of discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern...."

*Id.* at 1243 (quoting *Bethphage Lutheran Serv., Inc. v. Weicker,* 777 F.Supp. 1093, 1098 (D.Conn.1991)).

In assessing the degree of specificity of the state regulatory scheme, the district court in *Bethphage* took note of "the eighteen regulatory sections governing, substantively and procedurally, the determination of rates and the inclusion of particular costs." *Bethphage,* 965 F.2d at 1243. The court concluded that the state Medicaid regulations provided a "comprehensive statutory framework to formulate policy and decide cases." *Id.*

The second factor considered by the district court was whether the decision would require interpretation of "broad terms" in the state statutes "that properly should be interpreted by a state agency and the experts in a particular field." *Id.* The district court held that "the statutory framework at issue necessarily invokes the expertise and best judgment of the Commissioner of Mental Retardation and does not lend itself to consistent judicial interpretation." *Id.* The court noted that "reasonable persons can disagree as to what constitutes reasonable payments for necessary services under the

Waiver Act and that a federal court might establish reimbursement rates either above or below those determined in state court." *Id.* The court reasoned that the potential for inconsistency inherent in such a situation " 'would create a divisive reimbursement rate in which providers with substantially the same needs are reimbursed at different rates, encouraging plaintiffs to forum shop.' " *Id.* at 1243–44 (quoting *Bethphage Lutheran Serv., Inc. v. Weicker,* 777 F.Supp. 1093, 1100 (D.Conn.1991)).[6] As a result, the district court held that " 'proper respect for the expertise of state officials and the expeditious and evenhanded administration of [the] state program[ ] counsels restraint.' " *Bethphage,* 777 F.Supp. at 1100 (quoting *Levy v. Lewis,* 635 F.2d 960, 964 (2d Cir.1980)) (alterations in original). To maintain a consistent interpretation of the state's plan, the court in *Bethphage* concluded that *Burford* abstention was appropriate.

Applying the third factor, the district court in *Bethphage* "found that abstention under *Burford* was appropriate because the subject matter ...—reimbursement rates under the Medicaid Act—is an area of legitimate state interest." *Bethphage,* 965 F.2d at 1244. The Medicaid Act requires states to create administrative frameworks that establish the methods and procedures to be used for procurement of and payment for care and services. On appeal, the Second Circuit stated, "Congress has recognized that the establishment and review of reimbursement rates is a legitimate state concern." *Id.*

Finally, the district court in *Bethphage* "considered the availability of a state remedy." *Id.* The court found that an adequate state remedy did exist and that the plaintiff was able "to challenge the service rates set ... by the Commissioner of Mental Retardation" through an administrative procedure specified in the Regulations of Connecticut State Agencies. *Id.* Under the Connecticut

---

5. The Court notes that "[a]pplication of the *Grimes* factors must be considered in conjunction with the Supreme Court's subsequent decision in [*New Orleans Pub. Serv., Inc.*], which refined the *Burford* doctrine." *Crawford v. Employers Reinsurance Corp.,* 896 F.Supp. 1101, 1104 (W.D.Okla.1995).

6. As the Second Circuit stated, "[i]n *Burford,* the Supreme Court observed that if a statutory standard lends itself to variation in its application and if conflicts in interpretation would be dangerous to the success of state policies, federal courts should abstain." *Bethphage,* 965 F.2d at 1243 (citing *Burford,* 319 U.S. at 332–34, 63 S.Ct. at 1106–08).

Administrative Procedures Act, the plaintiff could then appeal the administrative decision to State Superior Court and, ultimately, to the State Supreme Court.

In reviewing the decision of the district court, the Second Circuit stated that the only potentially relevant factor not considered below was "that in *Burford* Texas had created a centralized system of judicial review of commission orders, which 'permit[ted] the state courts, like the Railroad Commission itself to acquire a specialized knowledge' of the regulations and industry...." *Id.* at 1245 (quoting *Burford,* 319 U.S. at 327, 63 S.Ct. at 1104) (alteration in original). Under the facts of *Bethphage,* the Second Circuit found "no such consolidation of judicial review," but held that "this factor has never been thought to be indispensable to *Burford* abstention." *Id.*[7] The court concluded that the district court correctly abstained under the *Burford* doctrine. *Id.* at 1248.

■ In the instant case, Defendants argue that abstention is appropriate under the *Burford* doctrine. The Court concludes that under the facts present here, the issue of abstention is controlled by the decisions in *Grimes* and *Bethphage* described above. Accordingly, the following factors should guide the Court's decision: (1) whether the suit is based on a cause of action that is exclusively federal in nature, (2) whether the suit requires the court to determine issues that are directly relevant to the rate appeal proceeding or Oklahoma policy in the administration of the Oklahoma Plan, (3) whether the Oklahoma Medicaid State Plan indicates a desire to create special state forums to regulate and adjudicate these issues, and (4) whether difficult or unusual state laws are at issue. *See Grimes,* 857 F.2d at 704–05; *see also Bethphage,* 965 F.2d at 1243–45.

■ Applying these four factors, it is well settled that jurisdiction for claims brought under section 1983 is not exclusive in federal court, since such claims may be pursued in state court. *See, e.g., Robert K. Bell Enterprises, Inc., v. Tulsa County Fairgrounds Trust Auth.,* 695 P.2d 513, 517

(Okla.1985). Thus, Plaintiff's suit, seeking injunctive relief to prevent DHS's offset against future payments, is not based on an exclusively federal cause of action. Plaintiff's third amended complaint is brought pursuant to 42 U.S.C. § 1983 "to enforce civil rights conferred under provisions of the Medicaid Act...." Third Amended Complaint at ¶ 5. Moreover, as discussed above, Plaintiff's claims in the instant case are not based on a systemic defect, but rather arise out of allegedly inadequate reimbursement payments to one hospital, TRMC. *Cf. Virginia Hosp. Ass'n v. Baliles,* 868 F.2d 653, 657 (4th Cir.1989) (distinguishing the case at hand from another case where "[t]he substantive issue ... is not, as here, the propriety of reimbursement rates generally, but whether providers are entitled to a certain type of reimbursement"). Thus, there is nothing "exclusively federal" about this cause of action that would counsel against abstention.

Secondly, the Court finds that to grant the relief requested by Plaintiff would require the Court to determine issues directly relevant to the general administration of the Oklahoma Plan and the rate appeal process. Oklahoma, in its administration of the Medicaid program, has a very complex system of reimbursement. As part of this system, Oklahoma has a fairly extensive appeals process in place, as required by federal law. *See* 42 C.F.R. § 447.253(c) (requiring the state to have an appeals process). An appeal may be taken from the administrative proceedings under the provisions of the Oklahoma Administrative Procedures Act ("APA"). Okla. Stat. tit. 75, § 250 *et seq.* Section 318(B) of the Oklahoma APA provides for judicial review by either by "appellate proceedings in the Supreme Court of Oklahoma" or by filing a petition in the state district court. This appeals process allows individual hospitals, such as TRMC, to challenge reimbursement rates in a manner that promotes consistent decisions.

Furthermore, the Oklahoma Plan has been designed and administered in response to a

---

7. The Second Circuit noted that "[e]very abstention case is to be decided upon its particular facts and not with recourse to some 'mechanical

checklist.'" *Bethphage,* 965 F.2d at 1245 (quoting *Law Enforcement Ins. Co. v. Corcoran,* 807 F.2d 38, 40 (2d Cir.1986)).

complex set of competing demands. DHS must administer Medicaid funding for every hospital in the state and do so in compliance with the mandates of the federal government. The goal of the Oklahoma Plan is to satisfy these demands in a consistent and uniform manner. By granting Plaintiff's request for relief, and thereby modifying the rate by which TRMC is reimbursed under the Oklahoma Plan, would require the Court to decide issues potentially disruptive to this goal of uniform treatment of all state hospitals.

Third, the Oklahoma Plan includes a specific rate appeal process available to any hospital seeking to dispute its reimbursement.[8] *See* OAC 317:30–5–54. Oklahoma has an important stake in maintaining its reimbursement system. To function effectively, DHS must achieve uniformity in determining which appeals are granted or denied and a consistent application of the burden of proof standard in each proceeding.

Fourth, the state Medicaid Plan at issue in this case is controlled by complex and difficult state law. *Cf. Grimes,* 857 F.2d at 705 ("In the instant case the state of Oklahoma has formulated a complex and comprehensive scheme of insurance regulation which contains the Uniform Insurers Liquidation Act...."). While it would be possible to render a decision in this matter, the Court believes that any such decision would unduly interfere with a complex state system established for the purpose of coherent regulation. Exercising jurisdiction in this case would disrupt the ability of the OHCA to efficiently and consistently operation the system of administration established under the state statutes. *See id.* at 706. Moreover, there exists ample opportunity for administrative and state judicial review. Thus, it is clear that abstention under *Burford* is appropriate.

 Unlike other forms of federal court abstention, *Burford* abstention requires the Court to dismiss the case rather than merely stay the proceedings pending state court adjudication. Chemerinsky, at 707. The Court has balanced TRMC's choice of forum

against the importance of maintaining a harmonious relationship between the state and federal governments. Consequently, the Court will refrain from becoming involved with state policy making and administration of the Oklahoma Plan. Thus, the Court hereby abstains and Plaintiff's third amended complaint is hereby dismissed.

Because the Court holds *Burford* abstention appropriate in this case, the Court need not reach the other arguments raised in Defendants' motion for summary judgment. Furthermore, the dismissal of this action vacates the temporary injunctive order previously issued by the Court, thus rendering moot Defendants' Motion to Assess Security Bond or in the Alternative to Modify Temporary Injunctive Order (Docket # 74).

IT IS SO ORDERED.

---

8. Which appeal process TRMC utilized on June 23, 1993. *See supra* ¶ 27.